# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------- x
In re VEECO INSTRUMENTS, INC.            :        Case No.: 7:05-md-01695 (CM)
SECURITIES LITIGATION                    :
----------------------------------------------------- x
----------------------------------------------------- x
THIS DOCUMENT RELATES TO                 :
ALL ACTIONS                              :
----------------------------------------------------- x
```

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett  (I.D. 17646)
Phyllis M. Parker (I.D. 77336)
Jeffrey L. Osterwise (I.D. 201859)
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875 - 3000
Fax: (215) 875 - 4604

*Lead Counsel for Lead Plaintiff*
*Steelworkers Pension Trust and the Class*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.     THE COMPLAINT PROPERLY ALLEGES THAT DEFENDANTS
MADE MATERIALLY FALSE AND MISLEADING STATEMENTS . . . . . . . 6

     A.    The Restatement Demonstrates that Veeco's Financial Statements
for the First Three Quarters of 2004 Were Materially False and
Misleading When Issued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.    Defendants' False and Misleading Statements Were Material and Are
Not Protected by the "Bespeaks Caution" Or Safe Harbor Defenses . . . . 7

     C.    Defendants' "Mismanagement" Argument is Meritless . . . . . . . . . . . . . 11

II.    PLAINTIFF HAS MORE THAN ADEQUATELY PLED SCIENTER . . . . . . . 12

     A.    Plaintiff Pleads Specific Facts that Constitute Strong Evidence of
Defendants' Conscious Misbehavior or Recklessness . . . . . . . . . . . . . . 13

          1.    Direct Evidence That Defendants Fraudulently Recognized
Revenue in Connection with the Sanan Group Contract . . . . . . . 13

          2.    Direct Evidence That Defendants Knowingly Failed To
Increase Reserves For Warranty Claims . . . . . . . . . . . . . . . . . . . 17

          3.    Direct Evidence That Defendants Knowingly Failed To
Write Down Impaired Inventory in Violation of GAAP . . . . . . . 19

          4.    Direct Evidence That Defendants Knew of or Recklessly
Ignored the Fraudulent Recognition of Revenues in
Connection With the TSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          5.    TurboDisc Was a Central Component of Veeco's Business . . . . 22

6.     Defendants Ignored Red Flags About Veeco's Internal Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.     The Absence of Inside Sales Does Not Negate Scienter . . . . . . . . . . . . . 24

IV.     PLAINTIFF'S SECTION 20(a) CLAIMS SHOULD NOT BE DISMISSED . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLES OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*Caiola v. Citibank N.A.*, 295 F.3d 312 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Dura Pharm., Inc. v. Broudo*, 125 S.Ct. 1627 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Epstein v. Itron, Inc.*, 993 F. Supp. 1314 (E.D. Wash. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 7, 11, 18

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . 9

*In re American Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424 (S.D.N.Y. 2000)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, 15, 16, 18

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192 (S.D.N.Y. 2004)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 23

*In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810 (E.D.N.Y. Mar. 30, 2004) . . . . . . . . . . 25

*In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 23, 24, 25

*In re Complete Mgmt. Sec. Litig.*, 153 F. Supp 2d 314 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . 16

*In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Daou Sys., Inc.*, 411 F.3d 1006 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Donna Karan Int'l Sec. Litig.*, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) . . . . . . . . . . . 11

*In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751 (N.D. Ohio 2003) . . . . . . . . . 9

*In re Fleming Cos. Sec. & Derivative Litig.*, 2004 U.S. Dist. LEXIS 26488 (E.D. Tex.
June 10, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251 (D. Mass. 2001) . . . . . . . . . . . . . 18

*In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) . . . . . . . . . 14

*In re Globalstar Sec. Litig.*, 2003 WL 22953163 (S.D.N.Y. Dec. 15, 2003) . . . . . . . . . . . 10, 11

*In re KeySpan Corp. Sec. Litig.*, 2003 WL 21981806 (E.D.N.Y. July 30, 2003) . . . . . . . . . . . . 8

*In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . 18, 19

*In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) . . . . . . . . . . . . . . . 15

*In re Mobile Media Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . 9, 10

*In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613 (S.D.N.Y. 2003) . . . . . . 8, 9, 10, 25

*In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290 (S.D.N.Y. 1999) . . . . . . . . . . 24

*In re Regeneron Pharmaceuticals, Inc. Sec. Litig.*, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) . 10

*In re Retek, Inc. Sec. Litig.*, 2005 WL 3059566 (D. Minn. Oct. 21, 2005) . . . . . . . . . . . . . . . . 22

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722 (N. D. Ill. 2003) . . . . . . . . . . . . . 23

*In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150 (C.D. Cal. 2003) . . . . . . . . . . 25

*In re Tel-Save Sec. Litig.*, 1999 WL 999427 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158 (S.D.N.Y. 2003) . . . . . . . . . . . . 8

*Lewin v. Lipper Convertibles, L.P.*, 2004 WL 1077930 (S.D.N.Y. May 13, 2004) . . . . . . . . . . 14

*Manavazian v. ATEC Group, Inc.*, 160 F. Supp. 2d 468 (E.D.N.Y. 2001) . . . . . . . . . . . . . . 9, 23

*McBride v. Vision Twenty-One*, 2000 WL 33996239 (M.D. Fla. Aug. 21, 2000) . . . . . . . . . . . 8

*Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . 9

*Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Pirraglia v. Novell, Inc.,* 339 F.3d 1182 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rombach v. Chang,* 355 F.3d 164 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*TSC Indus. v. Northway, Inc.,* 426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Zaretsky v. E.F. Hutton & Co., Inc.,* 509 F. Supp. 68 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . 24

**STATUTES**

15 U.S.C. §§ 78j(b) and 78(t)(a), 17 C.F.R. § 240.10b-5, Sections 10(b) and 20(a)
of the Securities Exchange Act and Rule 10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 25

**FEDERAL RULES**

Fed.R.Civ.P. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**OTHER AUTHORITIES**

SEC Release Staff Accounting Bulletin No. 99 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Lead Plaintiff, the Steelworkers Pension Trust, submits this memorandum of law in opposition to Defendants' motion to dismiss the Consolidated Class Action Complaint (the "Complaint").

## INTRODUCTION

The Complaint describes with great specificity a wide-ranging accounting fraud, complete with repeated, blatant, and deliberate violations of both Generally Accepted Accounting Principles ("GAAP") and the Company's own accounting policies, and three consecutive quarters of admittedly false financial statements. By restating Veeco's financial statements for the first three quarters of 2004, Defendants admitted that those results contained material errors and did not conform to GAAP when issued.

In the face of the Complaint's specific and concrete allegations of earnings manipulation, including *direct evidence* that would permit a jury to conclude that Defendants *knowingly* engaged in securities fraud, Defendants advance several unpersuasive arguments for dismissal. Defendants first argue that their statements were immaterial; that they are shielded from liability by the "bespeaks caution" doctrine and "safe harbor" provisions of the PSLRA; and that their accounting schemes amount to nothing more than inactionable "corporate mismanagement." However, there is no question that the misrepresentations and omissions at issue here were material to investors. Defendants' representations were directed to TurboDisc – a key business for Veeco – and included specific and consistent representations regarding the alleged success of TurboDisc and its products. Furthermore, none of Defendants' statements or omissions are protected by the safe harbor or "bespeaks caution" doctrine, and Plaintiff alleges far more than "corporate mismanagement." Having chosen to speak about the success of TurboDisc and its products, including the purported

1

"cost savings" and gross margin improvements resulting from the acquisition, Defendants assumed a duty to provide complete and non-misleading information on those subjects.

Defendants' scienter arguments also fail. Contrary to Defendants' "fraud by hindsight" accusation, the Complaint not only alleges facts that give rise to a "strong inference" of scienter, it pleads *direct evidence* that Defendants deliberately and knowingly manipulated Veeco's financial results in violation of GAAP and the Company's own accounting policies. Plaintiff also specifically alleges facts establishing a strong inference of Defendants' conscious misbehavior or recklessness.

Accordingly, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

Veeco designs, manufactures, markets and services a broad line of tools, equipment and systems used by leading manufactures in the data storage, semiconductor, and wireless industries, including equipment used to make high brightness light-emitting diodes (HB-LEDs) used in wireless phones, digital cameras and cars. ¶28-30. On November 3, 2003, Veeco acquired a business called TurboDisc which manufactured MOCVD (Metal Organic Chemical Vapor Deposition) reactors called the GaNzilla reactor, a more advanced line of process equipment than Veeco's existing product. ¶30. Veeco hoped to become a "one-stop shopping" source for users of certain technology. ¶30. The TurboDisc acquisition was a huge investment for Veeco, costing more than 20% of Veeco's equity. ¶¶32, 140. Veeco proclaimed that TurboDisc would yield cost-saving "synergies" under its ownership that would dramatically increase TurboDisc's gross margin to 46% and its operating profit to 15%, from its previous 36% gross margin and 3.7% operating profit under its former owner. ¶32, 80. Throughout the Class Period, Defendants specifically represented that the TurboDisc was actually achieving this 45-46% margin success. *See e.g.,* ¶¶84, 100.

2

On February 11, 2005, Veeco shocked the market by announcing that it would postpone the release of audited results for the 2004 fourth quarter and full year pending completion of an internal investigation of "improper accounting transactions" at its TurboDisc division which Veeco had acquired from Emcore in November 2003, and that the investigation focused principally on the value of inventory, accounts payable, and certain liabilities, as well as certain revenue transactions of TurboDisc. ¶2. Veeco stated that it expected that this investigation would lead to adjustments requiring the restatement of the financial statements previously issued for the quarterly periods and nine months ended September 2004, which would reduce Veeco's pre-tax earnings for the nine months ended September 30, 2004 by about $5.5 to $7.5 million. ¶2.

Following this announcement, shares of Veeco fell $1.90 per share, or 10.07 percent, from $18.86 at the close of trading on February 10, 2005, to $16.96 per share at the close of trading on February 11, 2005, on unusually high trading volume of 5.7 million shares, on a day when market indicators rose, thereby damaging Lead Plaintiff and the Class. In a conference call with analysts, Defendants acknowledged that there were significant "control deficiencies" at TurboDisc and that the improprieties "masked" more fundamental profitability problems at TurboDisc. ¶3. In the weeks following the disclosure, the price of Veeco stock continued to slide, falling to $13.97 at the close of trading on March 15, 2005. ¶3. On March 16, 2005, the Company announced that it had completed its internal investigation and had determined that the restatement would be larger than anticipated and would decrease originally reported pre-tax earnings for the first three quarters of 2004 by a total of $10.2 million - or $2.8 million, $4.3 million and $3.1 million for the three month periods ended March 31, 2004, June 30, 2004 and September 30, 2004, respectively. ¶4. Defendants admitted that the accounting improprieties had concealed TurboDisc's serious unprofitability, stating

3

in Veeco's 2004 Form 10-K filed that day: "The most serious profitability issue Veeco faced during 2004 was at its TurboDisc business unit." ¶6. The Company also admitted in the Form 10-K that "a deficiency existed in the internal control over financial reporting at the end of [each of the three] quarterly periods." ¶92. On April 1, 2005, the company actually issued the restatement. ¶5.

Defendants' financial statements and other Class Period statements touting TurboDisc's contribution to Veeco's margin growth and profitability were false and misleading because Defendants failed to disclose the material information that they were instituting risky and untested cost-cutting practices at TurboDisc, and that they were engaging in improper accounting practices in violation of GAAP.

Defendants' false and misleading statements during the Class Period fall into two categories: (1) Defendants' statements touting TurboDisc's growth and synergies with Veeco and (2) Defendants' false and misleading financial statements in Veeco's press releases and financial reports for the first, second and third quarters of 2004. Based on statements from former Veeco employees, Plaintiff has alleged that Defendants' statements concealed the truth about TurboDisc's true profitability. ¶¶6-7. Defendants engaged in an undisclosed fraudulent scheme to increase TurboDisc's reported margins and profits by initiating radical cost-cutting measures which, however, compromised the quality of the TurboDisc MOCVD reactor, and jeopardized the Company's reputation and customer acceptance of this key product. ¶¶34-38. Moreover, Defendants failed to disclose that after the acquisition, TurboDisc's accounting department had been reduced from a standing staff of six to eight people under previous owner Emcore, to two under Veeco. The cutback materially weakened TurboDisc's internal accounting controls and created an environment that permitted Defendants to conceal the

false financial reporting. ¶39. The details of the restatement of their financials after the Class Period

confirmed the impropriety of these accounting manipulations. ¶¶123-124.

The components of Defendants' alleged accounting fraud were:

(1) *Defendants' fraudulent recognition of $1.26 million of revenue in the first three quarters of 2004 from a Transitional Services Agreement* ("TSA") *with Emcore* by recording reduced-price sales to Emcore at full prices and by recording free give-aways to Emcore as revenue, and Defendants' express instruction to CW3 to "bury" the adjustment to the overstatement in the fourth quarter of 2004 in violation of GAAP. ¶¶45-56.

(2) *Defendants' fraudulent premature recognition of revenue from a contract to sell $10 million of GaNzilla reactors to the Sanan Group in China.* Defendants violated GAAP, the explicit terms of the Sanan Group contract, and Veeco's own revenue recognition accounting policies by recognizing revenue from a contract to sell TurboDisc reactors to the Chinese Sanan Group customer, even though the terms of the contract were not yet fulfilled ¶88, 58-59. The effect was to inflate Veeco's revenues by, respectively, $3.6 million, $3.6 million and $2.2 million, in the first, second and third quarters of 2004. ¶¶59, 124.

(3) *Defendants' undisclosed understatement of warranty losses caused by Veeco's switch to in-house manufactured parts for TurboDisc reactors instead of reliable outsourced vendors.* To rapidly cut costs and sharply increase margins to 46%, Defendant Braun instituted a risky program of manufacturing critical precision TurboDisc components in-house instead of purchasing them from reliable outside sources as Emcore had previously done. ¶¶64-65. Thus, parts failures began immediately after Veeco acquired TurboDisc, leading to customer complaints and unusual increases in warranty claims, especially of critical reactor filaments that burned out prematurely rendering the reactors unworkable. ¶¶62-69. Defendants Braun and Rein however, refused to reflect a charge to income to reflect these known accruals for warranty losses, in violation of GAAP and the Company's own internal accounting policies. ¶¶71, 88.

(4) *Defendants' undisclosed failure to write down over $5.6 million of stockpiled unsaleable TurboDisc reactors.* To accelerate the manufacturing cycle and "hit the market while it was hot" with large quantities of reactors, Defendant Braun initiated the risky strategy of having TurboDisc build "generic" MOCVD reactors, instead of the customized reactors TurboDisc had historically built to customer's specifications. ¶35. The speculative venture resulted in an accumulation of virtually worthless machines because (a) they were built with Veeco's defective in-house manufactured components, and therefore were non-working; and (b) they could not be sold because customers wanted reliable machines built to their specifications. ¶¶75-77. In violation of GAAP and its Veeco's own accounting policies, Defendants failed to write down about $5.6 million to reflect stockpiles of

unsaleable, devalued and even worthless inventory, which Defendants ultimately restated after the Class Period. ¶¶76, 88.

## ARGUMENT[1]

### I. THE COMPLAINT PROPERLY ALLEGES THAT DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS

#### A. The Restatement Demonstrates that Veeco's Financial Statements for the First Three Quarters of 2004 Were Materially False and Misleading When Issued

Plaintiff has more than adequately alleged that Veeco's financial statements for the first three quarters of 2004, as well as the press releases reporting those results, were materially false and misleading when made. ¶¶84-116. As this Court has recognized, "[f]inancial reports stating profits and losses of a company are, of course, of great interest to investors, and are ordinarily material to the decision of a shareholder to buy or sell a share." *In re ABN*, 93 F. Supp.2d at 442-43. Furthermore, as the SEC has made clear, "[b]y filing restated financial statements with the Commission, a company announces that it had previously materially misstated its financial condition or its results of operations." ¶125. Indeed, restated financial statements demonstrate both "that there was a misstatement in the original financial statements" and "that the misstatement was material." ¶125.[2] Thus, none of Defendants' materiality or particularity challenges apply to the Complaint's

---

[1] In deciding this motion, the Court must accept the facts alleged in the Complaint as true, and the Complaint should be liberally construed in favor of Plaintiff. *See In re American Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 434 (S.D.N.Y. 2000)(McMahon, J.)("*In re ABN*"); *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 206 (S.D.N.Y. 2004). The "Court's function on a motion to dismiss is 'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *In re ABN*, 93 F. Supp.2d at 434 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). Accordingly, "if the Complaint, read as a whole, can be construed to state any claim on which relief may be granted, [the Court] must not dismiss it." *In re ABN,* 93 F. Supp. 2d at 434.

[2] This is so because under GAAP, "previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally

well-pleaded allegations of materially false and misleading quarterly financial statements and press releases reporting those results. *See* ¶¶84-116.

**B.    Defendants' False and Misleading Statements Were Material and Are Not Protected by the "Bespeaks Caution" Or Safe Harbor Defenses**

Defendants erroneously contend that all of their statements concerning TurboDisc constituted immaterial "statements of optimism." Defs. Mem. at 7-8. "[A]lleged misrepresentations are inactionable as a matter of law" only when "reasonable minds cannot differ on the question of materiality." *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *See also Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 162 (2d Cir. 2000). As this Court has recognized, a statement or omission is material if there is a "'substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" *In re ABN*, 93 F. Supp. 2d at 442 (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988)).

Here, there is no question that the misrepresentations and omissions at issue could have influenced a reasonable investor in deciding whether to purchase Veeco shares. Defendants' misrepresentations were directed to the performance of TurboDisc – an indisputably key business for Veeco – and included specific representations, purportedly based on contemporaneous facts, regarding the alleged success of TurboDisc and its MOCVD products.[3] For example, Defendants announced that the TurboDisc acquisition would result in "$4 million a year" in "cost savings," and

---

issued." *In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*, 324 F. Supp. 2d 474, 486(S.D.N.Y. 2004); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001)("the mere fact that ... statements were restated at all" is sufficient to establish falsity at the pleading stage).

[3] That TurboDisc was a central element of the Company's expected and reported financial success is clear from Defendants' own repeated emphasis on the contributions and importance of the MOCVD product line. *See, e.g.,* ¶100. *See infra* at pp. 22-23.

represented not only that the Company *would* achieve, but that it *was in fact achieving* a "45% gross margin," which Defendants specifically "attribut[ed] to growth from the [TurboDisc] MOCVD" acquisition. ¶¶80, 100. In truth, any "growth" in TurboDisc sales was wholly illusory, and possible only because Defendants had fraudulently and prematurely recognized product and service revenues in violation of GAAP; improperly failed to increase reserves against rising warranty claims from defective reactor components made in-house; and failed to write down stockpiles of unsaleable inventory. *See* ¶¶81, 83, 85, 101.

Thus, as in *In re ABN*, 93 F. Supp. 2d at 443, Defendants' statements "did not reflect generalized optimism about the future, but rather the position that [Veeco] was *at the time [defendants] made the statement,"* experiencing growth in TurboDisc sales, and improvements in gross margins and cost benefits as a result of the acquisition. (Emphasis in original). *See also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003)("recitations of (allegedly inaccurate) historical facts" were "not simply 'soft' predictions.").

Defendants' statements underscoring the success of TurboDisc are also actionable because Plaintiff has alleged sufficient facts demonstrating that Defendants did not "genuinely or reasonably believe [the statements] at the time they were made." *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003)(citations omitted).[4] *See, e.g.,* ¶¶81, 83, 86, 101, 104. Indeed, courts have upheld far less specific statements about the expected benefits of an acquisition. *See, e.g., McBride v. Vision Twenty-One,* 2000 WL 33996239, at *4-5 (M.D. Fla. Aug. 21, 2000) (statements concerning benefits of acquisition and the "synergies of the combined company" not

---

[4] *See also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000); *In re KeySpan Corp. Sec. Litig.*, 2003 WL 21981806, at *17 (E.D.N.Y. July 30, 2003)(optimistic statements not puffery where complaint permitted inference that defendants knew statements misrepresented existing facts).

"puffing" or protected by safe harbor where plaintiff alleged that defendants made the statements with knowledge of their falsity).[5]

Nor are Defendants' statements concerning TurboDisc protected by the "bespeaks caution" or safe harbor defenses. These protections apply only to forward-looking statements, and the cautionary language cited must "'precisely address the substance of the specific statement or omission that is challenged.'" *In re Nortel Networks*, 238 F. Supp. 2d at 628 (citation omitted). "Neither doctrine applies to allegations of misrepresentations of existing facts." *Manavazian v. ATEC Group, Inc.*, 160 F. Supp. 2d 468, 481 (E.D.N.Y. 2001). "[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999).

Defendants do not identify the statements they contend were forward-looking, and their lack of specificity is a sufficient basis to reject their argument out-of-hand. *See, e.g., In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 764 (N.D. Ohio 2003)(court only analyzed statements specifically identified by the defendants as "forward-looking"). The vast majority of the challenged statements are not forward-looking, but are instead false representations concerning the *current* or *historical* performance of Veeco and TurboDisc.[6] Because Defendants' statements

---

[5] *In re Mobile Media Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998)(statement linking future success with present acquisition was not mere "puffery"); *In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (positive statements regarding the integration of Aetna and U.S. Healthcare held actionable where defendants allegedly knew contrary adverse facts).

[6] *See, e.g.,* ¶84 ("The growth of this newly acquired product line [TurboDisc's MOCVD] *has surpassed* our initial expectations); ¶100 (reporting on *"current growth* in '04," defendant Braun represented that Veeco *was having* "a strong revenue and earnings recovery year," with "growth in all 'core' markets, including LED/wireless," "attributable to growth from [TurboDisc] MOCVD," and stating that "the recovery of the MOCVD gross margin *contributes to the improvement* in [Veeco's process] equipment [segment] margin at the end of the year"). *See also,* ¶86.

9

"involve representations of present or historical facts," neither the safe harbor nor the bespeaks caution doctrine applies. *In re Regeneron Pharmaceuticals, Inc. Sec. Litig.*, 2005 WL 225288, at *13-14 (S.D.N.Y. Feb. 1, 2005). *See also In re Nortel*, 238 F. Supp. 2d at 629 ("even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision does not apply").

Furthermore, the boilerplate warnings upon which Defendants rely do not adequately "bespeak caution" and are insufficient under the safe harbor. As both this Court and the Second Circuit have recognized, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *In re AOL Time Warner*, 381 F. Supp. 2d at 223. Thus, Defendants' generalized warnings of "unpredictable" risks associated with hypothetical acquisitions did not cure their misrepresentations and omissions of *existing, known,* and material risks and *current* problems associated *specifically* with the TurboDisc acquisition. *See, e.g., In re Nortel*, 238 F. Supp. 2d at 628-629.[7]

Finally, even if Defendants' statements were forward-looking or accompanied by meaningful, specifically tailored cautionary language – which they were not – they still would be actionable because Plaintiff has alleged with particularity that Defendants 1) did not believe their statements to be true; 2) had no reasonable basis to believe their statements to be true; and 3) failed to disclose facts that seriously undermined the veracity of their statements. *See* ¶¶81, 101, 104, 108.[8]

---

[7] Indeed, courts have determined similar boilerplate warnings of possible integration difficulties to be not only insufficient under the bespeaks caution and safe harbor defenses, but *themselves* materially misleading where, as here, Defendants knew they were *already experiencing* integration problems. *See, e.g., In re Mobile Media*, 28 F. Supp. 2d at 930.

[8] *See Goldman v. Belden*, 754 F.2d 1059, 1068-69 (2d Cir. 1985); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 557 (6th Cir. 2001); *In re Globalstar Sec. Litig.*, 2003 WL 22953163, at *9 (S.D.N.Y.

## C.    Defendants' "Mismanagement" Argument is Meritless

Defendants' argument that they are not liable for Veeco's "unwise business decisions" is based on a distorted characterization of the Complaint and a misguided view of the law, and should be rejected. *See* Defs. Mem. at pp. 10-11.

Plaintiff alleges that Veeco's actions in manufacturing components for TurboDisc products in-house and building TurboDisc reactors "to stock" led directly to: 1) sharply decreased sales; 2) seriously increased warranty costs; and 3) stockpiles of unsaleable inventory. ¶¶62-77, 133-34. In violation of GAAP, however, Defendants failed to increase warranty reserves and failed to writedown the unsaleable inventory, ultimately resulting in over $5 million in understated expenses. ¶¶133-34. The undisclosed facts regarding the disastrous financial consequences of defendants' in-house component manufacturing and "build to stock" programs would without question be "considered significant" by a reasonable investor in making an investment decision, and thus were required to be disclosed. *See Ganino,* 228 F.3d at 161.

Furthermore, "[a]lthough poor business judgment is not actionable under federal securities laws, a plaintiff has alleged more than mere corporate mismanagement" where - as here - "he has adequately alleged that the defendant made false statements concerning historical facts." *In re Atlas Air,* 324 F. Supp. 2d at 494 n.11; *In re Donna Karan Int'l Sec. Litig.,* 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998)("The mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim under the federal securities laws if the defendant...failed to disclose a specific material fact resulting from that mismanagement.")

---

Dec. 15, 2003)(forward-looking statements may be actionable if "the speaker does not genuinely or reasonably believe them".... "Cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made.")(citations omitted).

Having chosen to speak about the success of TurboDisc and its products, including the purported "cost savings" and gross margin improvements resulting from the acquisition, Defendants assumed a duty to provide complete and non-misleading information with respect to those subjects. *See Caiola v. Citibank N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)("upon choosing to speak, one must speak truthfully about material issues"). Thus, Defendants' failure to disclose material facts on those topics – even if they may also concern mismanagement – rendered their other statements misleading and thus violated Rule 10b-5. *See, e.g., In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004) ("[O]nce a corporation speaks on a subject, it must speak truthfully and completely. Hence, a failure to disclose facts that amount to mismanagement may render other statements misleading.").

## II.    PLAINTIFF HAS MORE THAN ADEQUATELY PLED SCIENTER

Defendants challenge Plaintiff's scienter allegations only "with respect to accounting items that were restated," arguing that those claims are deficient because the Complaint purportedly fails to "identify specific facts establishing conscious misbehavior or recklessness." *See* Defs. Mem. at 12, 15. This argument grossly misrepresents the allegations of the Complaint, ignores the Complaint's allegations of actual knowledge, and misconstrues the applicable law.    In fact, the Complaint not only alleges facts that give rise to a "strong inference" of scienter, it clearly pleads *direct evidence* that Defendants deliberately manipulated Veeco's financial results in violation of GAAP and the Company's own accounting policies.    This evidence – including statements from former Veeco employees based on personal knowledge – establishes that Defendants not only knew about, but actually *directed* the scheme to artificially inflate Veeco's reported results. *See In re Fleming Cos. Sec. & Derivative Litig.*, 2004 U.S. Dist. LEXIS 26488, at *97-111 (E.D. Tex. June 10, 2004)(rejecting scienter challenge where plaintiffs alleged "direct evidence," through statements

of confidential sources, demonstrating defendants' knowledge of and involvement in accounting

fraud). (Attached hereto as Exhibit A).

    **A.**    **Plaintiff Pleads Specific Facts That Constitute Strong Evidence of Defendants' Conscious Misbehavior or Recklessness**

        **1.**    **Direct Evidence That Defendants Fraudulently Recognized Revenue in Connection with the Sanan Group Contract**

As Defendants conceded with the restatement, Veeco's financial statements were materially

misstated for each of the first three quarters of 2004 by, among other improper accounting practices,

Defendants' premature recognition of revenues from the $10 million Sanan Group contract. ¶¶58-

60, 132. Defendants' deliberate recognition of revenues before the required work was completed

and customer acceptance of the TurboDisc reactors was obtained violated not only GAAP, but also

the terms of the Sanan contract and Veeco's own accounting policies. ¶¶58, 88.

According to confidential witness "CW3," a former high level Veeco accounting officer with

personal knowledge about  the reasons for the restatement (¶¶7, 133, 138-139), Defendants paid

Veeco employees working in China increased incentive bonuses in order to obtain fictitious

customer sign-offs stating (falsely) that the reactors had passed an on-site advanced materials

demonstration and had been accepted in writing by the customer. ¶59.  These bogus sign-offs

resulted in overstatements of revenue of approximately $3.6 million, $3.6 million, and $2.2 million

in Veeco's financial statements for the first, second, and third quarters of 2004, respectively. ¶59.[9]

The Complaint's allegations that Defendants violated both GAAP and  Veeco's own revenue

---

[9] Plaintiff also alleges, based on the statements of CW3: (1) Defendants "clearly understood the terms of the contract," and that a copy of the Sanan contract was sent to Defendants Rein and Braun(¶¶59, 60, 132); (2) the contract was a large $10 million order for "multiple" TurboDisc GaNzilla reactors (¶¶57, 132); and (3) the GaNzilla reactors were key products, and the Sanan contract was an important transaction to Veeco, as evidenced by Veeco's public statements. ¶57.

recognition policies raise a strong inference that Defendants knew or should have known that their statements were false when made. *See, e.g., In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *20 (E.D.N.Y. Sept. 19, 2005)(allegations that the defendants' accounting practices were "contrary to their stated policy and prior practice" are sufficient to allege a strong inference of conscious misbehavior or recklessness); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001)(same); *Novak*, 216 F. 3d at 311-312.[10]

Furthermore, "repeated and pervasive GAAP violations" – as Defendants engaged in here – "may be sufficient to establish the requisite inference." *Gilat*, 2005 WL 2277476, at *20. *See also Lewin v. Lipper Convertibles, L.P.*, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004)(repeated and pervasive GAAP violations can provide strong inference of scienter).    Similarly, accounting manipulations involving  premature revenue recognition are especially indicative of  conscious misbehavior or recklessness  since such violations "do not commonly occur inadvertently," but instead "suggest a conscious decision to improperly recognize revenue." *In re Gilat*, 2005 WL 2277476, at *21 (citation omitted).

Finally, the restatement "directly following the Class Period," which decreased revenue by $3.6 million of revenue in the first quarter $3.6 in the second quarters of 2004, and by $2.2 million in the aggregate nine-month third quarter financials, supports Plaintiff's contention that revenues

---

[10] Defendants do not dispute that Veeco's actions in prematurely recognizing revenues on the Sanan Contract were in violation of the Company's own revenue recognition policies, which provided that "[f]or products produced according to a particular customer's specifications, revenue is recognized *when the product has been tested and it has been demonstrated that it meets the customer's specifications and title passes to the customer.*" ¶88 (emphasis added). Because Defendants "knowingly sanctioned procedures that violated the Company's own...policy, as stated in the Company's public filings," Plaintiff has adequately alleged that "defendants engaged in conscious misstatements with the intent to deceive." *Novak*, 216 F.3d at 311-312.

were inflated "at the time the purportedly misleading statements were made." *Novak,* 216 F.3d at 312-313.[11]

Defendants' fraudulent intent is further confirmed by the obvious "significance" of the Sanan contract to Veeco, "which certainly makes less credible the inference that the Defendants were not aware of or did not recklessly disregard the accounting irregularities relating to th[is] contract[]." *In re MicroStrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 639 (E.D. Va. 2000). In addition, Defendants' Braun and Rein signed the Company's quarterly Forms 10-Q reports during the Class Period, which contained both the Company's stated policy for revenue recognition ("revenue [for custom-made products] is recognized when the product has been tested and it has been demonstrated that it meets the customer's specifications and title passes to the customer") and its falsely inflated financial results. ¶¶88-89. *See In re ABN,* 93 F. Supp. 2d at 448 (recklessness adequately pled by alleging that CFO and Comptroller were uniquely situated to control company's revenue recognition procedures, and revenues were materially inflated in repeated financials they signed).

Defendants' factual argument disputing the Complaint's allegations with respect to the date the Sanan contract was signed should be rejected as both improper on this motion and ultimately irrelevant.  The relevant facts – which Defendants do not contest – are that Defendants obtained fictitious sign-offs from the Sanan Group for the sole purpose of enabling Veeco to improperly and prematurely recognize $10 million of revenue, all in violation of GAAP, the Company's own stated

---

[11] Defendants' assertion that Veeco's "restatement related solely to the timing of revenue recognition and had no impact on Veeco's year-end revenue for 2004" (Defs. Mem. at 18 n. 15), ignores that the GAAP violation occurred in the three quarterly financials issued *during* the Class Period.  ¶¶123-124.  What happened in the year-end financials after the Class Period is irrelevant.

policy, and the Sanan contract itself, and that these accounting violations resulted in materially misstated financial statements during the Class Period. ¶¶58-60, 88.[12]

Defendants' argument that Plaintiff's allegations with respect to the Sanan fraud amount to "impermissible 'group pleading'" is equally misplaced. (Defs. Mem. at 19). "[P]laintiffs may engage in so-called group-pleading under 10(b) and Rule 10b-5; nothing in the PSLRA has altered that doctrine." *In re ABN*, 93 F. Supp. 2d at 442 (citations omitted). Furthermore, Plaintiff has sufficiently described CW3 under the PSLRA and the law of this Circuit, by identifying him as a "former Veeco employee who was a high level accounting officer at Veeco during the Class Period." ¶7. *See Novak*, 216 F. 3d at 314 (plaintiffs need only provide "a sufficient *general* description of the personal sources of the plaintiffs' beliefs.")(emphasis added). Indeed, Plaintiffs have detailed CW3's "first-hand knowledge," including that Defendant Braun "frequently telephoned CW3 to inquire about various items of revenue and expense," and that CW3 participated with Braun in TurboDisc "teleconferenced meetings" held every two weeks, and "one-on-one discussions." ¶¶133, 138-139. Moreover, although he has done so, Plaintiff is not required to allege further details such as *how* CW3 knew the information alleged in the Complaint. *Novak*, 216 F.3d at 314; *See also In re Complete Mgmt. Sec. Litig.*, 153 F. Supp 2d 314, 334-35 (S.D.N.Y. 2001).

---

[12] Although Defendants claim that the contract which shows an October 2003 start date shows an "obvious inaccuracy in the Amended Complaint," the issue is not so "obvious" and does not require the Court to make an impermissible evidentiary finding on this matter. (Serio Decl. Ex. I) For example, Defendants do not explain why the contract they appended to their motion was signed by Emcore, not Veeco, and involved a $14 million order. *See id.* Defendants also do not explain why Veeco waited six months, until April 26, 2004, to announce the $10 million order.

2.    **Direct Evidence That Defendants Knowingly Failed To Increase Reserves For Warranty Claims**

As Defendants admitted by the restatement, Veeco's earnings were materially overstated throughout the Class Period, in part because the Company failed to increase reserves for warranty claims. ¶¶70-74, 133. As with the Sanan contract allegations, the Complaint's allegations relating to this aspect of the fraud at Veeco are based on facts establishing Defendants' *actual knowledge*. For example, Plaintiff alleges that:

- *All three* confidential witnesses confirmed that the TurboDisc product failures resulting from faulty Veeco-manufactured parts began *immediately after* Veeco acquired TurboDisc, and CW3 has stated that defendant Braun directed TurboDisc to stop purchasing components from reliable outside suppliers. ¶¶62-66, 133;

- CW3 specifically stated that Braun took a keen interest in TurboDisc and frequently telephoned CW3 to inquire about various items of revenue and expense. ¶¶72, 133;

- As confirmed by CW3, by *mid-February 2004*, defendant Rein and every other member of Veeco's senior management *knew of the quality problems and the huge increase in warranty claims* because the problems were *openly discussed* at TurboDisc's February 2004 Semi-Annual Divisional Reviews. ¶¶71, 133;

- According to CW3, although there was a known, unusual increase in warranty claims, defendants Braun and Rein refused to permit Veeco's financial statements to reflect charges to income required to fairly reflect accruals for warranty losses, in violation of GAAP (FASB Statement No. 5, Accounting for Contingencies). CW3 stated that when CW3 prepared a $250,000 journal entry to properly increase the accrual for warranty costs, defendant Kiernan, at the instruction of defendant Rein, *specifically instructed CW3 to reverse the accrual.* ¶¶71, 133;

- Defendants *specifically admitted* that warranty costs "ha[d] been as high as 8%" during the Class Period. ¶¶70, 133.

In view of these compelling allegations of conscious misbehavior, Defendants' "mismanagement" argument should be rejected out of hand. *See* Defs. Mem. at 20. Plaintiff alleges, with great specificity, why accruals for warranty expenses were required and when they were

required. *See* ¶¶62-74. The Complaint also specifically explains that an accrual was prepared by CW3 and that this accrual was reversed by defendant Kiernan at defendant Rein's direction. ¶¶71, 133 . *See Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191-92 (10th Cir. 2003)(allegations that senior management recognized revenue over objections of accounting personnel, in violation of company's own revenue recognition guidelines, constituted "direct evidence of scienter"); *Novak*, 216 F.3d at 312. *See supra* at 13-16.[13] The restatement, which reinstated this journal entry, is prima facie evidence of the propriety of the original journal entry during the Class Period, when it was prepared. Defendants' argument that the accrual for warranty costs was "immaterial as a matter of law" (*see* Defs. Mem. at 21-22), is refuted by Defendants' own restatement. When they issued restated financial statements for the first three quarters of 2004, Defendants corrected the understatements of warranty reserves identified in ¶¶71-74 of the Complaint, thus *conceding* that the Company's prior accounting treatment was incorrect and resulted in *material* errors, including materially understated warranty costs. *See supra* at pp. 6-7.

The SEC has stated that "misstatements are not immaterial simply because they fall beneath a numerical threshold." *See* SEC Release Staff Accounting Bulletin No. 99, 1999 WL 1123073, at *1 (SEC Release Aug. 12, 1999)("SAB No. 99"). And the Second Circuit, in *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 163 (2d Cir. 2000), specifically stated that "qualitative factors may cause misstatements of quantitatively small amounts to be material." *Id.* (quoting SAB No. 99). *See also e.g., In re ABN*, 93 F. Supp. 2d at 448 (misrepresentations of subsidiary's revenues were material

---

[13] *In re Galileo Corp. Shareholders Litig.*, 127 F. Supp. 2d 251, 268 (D. Mass. 2001) (Defs. Mem. at 21), a case in which the plaintiffs did not even "assert the amount of the reserve that the defendants should have established," and which included no direct evidence of fraudulent intent such as the testimony of CW3 here, is inapposite.

18

to investors in parent even though subsidiary "represented only 9% of ABN's overall business"); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998).

### 3.  Direct Evidence That Defendants Knowingly Failed To Write Down Impaired Inventory in Violation of GAAP

By restating Veeco's financials a month after the Class Period to include a belated $5.56 million writedown of non-saleable inventory, Defendants effectively admitted both that the inventory was worthless and that a writedown was required during the Class Period. ¶76. *Novak,* 216 F. 3d at 312 (a "significant write-off of inventory directly following the Class Period... tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements were made"). Indeed, CW3 specifically stated that defendants Braun, Rein, and Kiernan knew of the inventory build-up throughout 2004 because the issue was discussed during semi-annual division reviews, twice-monthly conference calls and in quarterly binders prepared for management, and that Defendant Braun "took a keen interest in TurboDisc," "meticulously" reviewed monthly and quarterly financial reports from TurboDisc and phoned CW3 "all the time" with questions about "gross margin, inventory, revenue, bookings - everything." ¶¶72,77, 133, 137, 138. CW3 also explained that Defendant Braun had conceived the plan to substitute in-house manufactured parts instead of using reliable outside vendors, and to build and stock generic reactors instead of continuing to "build to order" reactors customized to individual customer's needs. ¶¶62-65. Moreover, two other witnesses corroborated the testimony of CW3 that "[a]lmost immediately after Veeco had purchased the TurboDisc Division customers began to have problems with the MOCVD reactors." ¶63. Failure to write down impaired inventory violated Veeco's own internal inventory accounting policy as well as GAAP (Accounting Res. Bulletin No. 43). ¶¶76, 88.

Defendants again attempt to recast their intentional failure to take the $5.6 million writedown during the Class Period as no more than a subjective "matter of business judgment." Defs. Mem. at 16. The Second Circuit rejected this precise argument. *Novak*, 216 F.3d at 312 ("[w]hen managers deliberately make materially false statements concerning inventory with the intent to deceive the investment community, they have engaged in conduct actionable under the securities laws "; district court's conclusion that this supported nothing more than a disagreement over matters of business judgment such as valuation of inventory was "incorrect as a matter of law").

### 4.    Direct Evidence That Defendants Knew of or Recklessly Ignored The Fraudulent Recognition of Revenues in Connection With the TSA

Plaintiff also provides direct evidence of Defendants' actual knowledge in connection with the TSA accounting fraud, which resulted in a $1.26 million overstatement of income between November 3, 2003 and September 30, 2004. *See* ¶¶49, 55, 135. The Complaint specifically describes, for example, how Veeco internal auditor Gary Reifert prepared a document which revealed that the amounts recorded as revenue on Veeco's books for parts, services and other items journalized as due from Emcore were improperly overstated and that an adjustment of $1.26 million was required as of September 30, 2004. ¶54. However, CW3 was *specifically instructed* by defendant Kiernan, at the direction of defendant Rein, to "book the adjustments in October," meaning that this material income overstatement was pushed into the fourth quarter of 2004, where it was buried with other adjustments. ¶¶55, 135. As set forth in the Complaint, Defendants' knowing failure to disclose the $1.26 million overstatement as of September 2004 violated GAAP and demonstrates Defendants' fraudulent intent. ¶¶55-56, 135.

20

Because the overstatement of $1.26 million during the Class Period was plainly material, there is no merit to Defendants' assertion that they had "no duty to spotlight the TSA issue" in Veeco's public filings. *See* Defs. Mem. at 23. In addition, GAAP (APB Opinion No. 16), provides that where an acquisition is accounted for as a purchase (as was the case with TurboDisc), the "[n]otes to the financial statements of an acquiring corporation should disclose," among other things, "commitments specified in the acquisition agreement and their proposed accounting treatment." Defendants wholly failed to comply with this GAAP requirement. ¶¶50-56.

Further, because certain "free" services were required to be provided to Emcore pursuant to the TSA, Defendants were required to make additional disclosures pursuant to GAAP (Accounting Principles Board Opinion No. 29, Accounting for Nonmonetary Transactions*)*, which provides that "[a]n enterprise that engages in one or more nonmonetary transactions during the period should disclose in financial statements for the period *the nature of the transactions, the basis of accounting for the assets transferred, and gains or losses recognized on transfers*." Defendants not only recorded free services provided to Emcore as revenue even though Veeco had no expectation of receiving payment for those services, in violation of GAAP, but completely failed to disclose the giveaway of services by Veeco to Emcore, also in direct violation of GAAP. *See* ¶47.[14]

Furthermore, consistent with *Dura Pharm., Inc. v. Broudo*, 125 S.Ct. 1627, 1631 (2005) the Complaint sets forth the overstatements of revenue relating to the TSA which occurred *during the*

---

[14] Defendants pretend to be confused by Plaintiff's TSA fraud allegations, positing that a company would not engage in a scheme to prematurely recognize revenue where the scheme "was inherently self-disclosing after a short period [.]" Defs. Mem. at 24. However, this is equivalent to arguing that Ponzi schemes make no sense because the pyramid they create will almost always collapse. The fact that Defendants' fraud was short-lived does not make it any less fraudulent, nor does it render Defendants' deliberate actions in directing the fraud any less deliberate.

21

*Class Period*, and links disclosure of those and other misstatements to steep and immediate declines in the value of Veeco's stock. *See* ¶¶2-3. Thus, the Complaint details Veeco's revelation, on February 11, 2005, that "it would postpone the release of audited results for the 2004 fourth quarter and full year pending completion of an internal investigation of *improper accounting transactions at its TurboDisc division* which Veeco had acquired from Emcore in 2003." ¶2. The Complaint specifies that the "improper accounting transactions" included "*certain revenue transactions of TurboDisc*," and further explains that "[f]ollowing this announcement, shares of Veeco fell $1.90 per share, or 10.07 percent," on unusually high trading volume. ¶¶2-3.

Because the TSA fraud was "part of a broader scheme" that "'began to be disclosed'" with the February 11 press release, and because the TSA scheme was "'inextricably linked' to" Defendants' fraudulent efforts to improperly recognize revenues and understate expenses of TurboDisc, Plaintiff has "alleged enough to survive *Dura*." *In re Retek, Inc. Sec. Litig.*, 2005 WL 3059566, at *4 (D. Minn. Oct. 21, 2005). *See also In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005)(plaintiffs adequately alleged loss causation where the allegations, if true, were sufficient to provide the defendant "with some indication that the drop in [the company's] stock price was causally related to [the company's] financial misstatements reflecting its practice of prematurely recognizing revenue before it was earned").

### 5. TurboDisc Was a Central Component of Veeco's Business

The fact that Defendants' alleged fraud relates to Veeco's key TurboDisc products also creates a strong inference of the Defendants' knowledge that TurboDisc's reported financial results were the product of GAAP violations and that Defendants' public disclosures concerning TurboDisc were materially misleading. *See* ¶¶134, 137, 141. Allegations of securities fraud relating to a

company's core business or products support a strong inference of scienter against the senior executives of the company. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (strong inference of scienter pled where plaintiffs alleged "facts from which one can reasonably infer that sales to [customers in China] were to represent a significant part of [the Company's] business"); *Atlas Air*, 324 F. Supp. 2d at 489 ("When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made."); *In re AOL*, 381 F. Supp. 2d at 240; *Manavazian*, 160 F. Supp. 2d at 481-82.

That TurboDisc was a central element of the Company's reported financial success is clear from Defendants' own repeated emphasis on the contributions and importance of the MOCVD product line. As Defendants themselves stated, Veeco's "growth going forward" was dependent on, and attributable to, "growth from the TurboDisc MOCVD and [Aii] precision lapping acquisitions." ¶100. In view of TurboDisc's admitted centrality to the Company's growth and success, Defendants' protests that TurboDisc's sales accounted for "only $62.7 million, or 16% of Veeco's total sales in 2004," ring hollow. *See* Defs. Mem. at 13 n.9. Furthermore, knowledge of facts relating to "an important transaction that would affect a company's performance" – such as the TurboDisc acquisition – are also properly attributed to officers of the company. *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N. D. Ill. 2003).[15]

---

[15] *In re Tel-Save Sec. Litig.*, 1999 WL 999427, at *5 (E.D. Pa. 1999)("Knowledge concerning a company's key businesses *or transactions* may be attributable to the company, its officers and directors")(emphasis added); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998).

### 6.    Defendants Ignored Red Flags About Veeco's Internal Controls

As Defendants ultimately admitted, during the Class Period TurboDisc was wholly deficient in effective internal accounting controls. ¶¶91-92, 136. The lack of internal controls was glaringly obvious to Defendants because, among other things, TurboDisc's accounting department had been reduced from a standing staff of six to eight people under Emcore, to *just two* under Veeco. ¶¶91, 136. As alleged, this cutback materially weakened TurboDisc's internal accounting controls and created and fostered an environment that permitted Defendants to conceal the accounting manipulations and false financial reporting. ¶91. Defendants, however, did not acknowledge until after the Class Period that "a deficiency existed in the internal control over financial reporting at the end of [the first three quarterly periods of 2004]." ¶¶92, 136. Defendants totally ignore Plaintiff's allegations demonstrating TurboDisc's lack of proper internal controls. But a failure to maintain sufficient internal controls to avoid fraud is indicative of scienter. *See Atlas Air*, 324 F. Supp. 2d at 497-98 (inadequate internal controls probative of scienter); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999)(disregard of internal controls deficiencies constituted recklessness); *Zaretsky v. E.F. Hutton & Co., Inc.*, 509 F. Supp. 68, 75-76 (S.D.N.Y. 1981)(same).

### B.    The Absence of Insider Sales Does Not Negate Scienter

Defendants' assertion that the absence of insider stock sales "negates any inference of fraud" (*see* Defs. Mem. at 13), is patently incorrect, as the Second Circuit has repeatedly and unequivocally held that pleading "motive and opportunity to commit fraud" is just *one* of *two distinct ways* to establish a strong inference of fraudulent intent. *See, e.g., Novak*, 216 F.3d at 307. Where – as here – a plaintiff has sufficiently pled that defendants knew their statements were misleading, or

24

otherwise acted with "conscious misbehavior or recklessness," "the Court need not reach the question of motive." *In re Nortel Networks*, 238 F. Supp. 2d at 630.

Indeed, numerous courts have specifically rejected the argument that the failure of certain defendants to sell stock undercuts a finding of scienter. *See, e.g., In re Ashanti Goldfields Sec. Litig.*, 2004 WL 626810, at *5 (E.D.N.Y. Mar. 30, 2004)("when the claim is based on conscious misbehavior or recklessness," net purchases or sales of stock by defendants "do not necessarily negate an inference of scienter on a motion to dismiss"); *In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003). "Since in this case the scienter claims are based upon conscious misbehavior, whether defendants were net buyers or net sellers of [Veeco] is irrelevant." *In re Ashanti*, 2004 WL 626810, at *5.

## IV.   PLAINTIFF'S SECTION 20(a) CLAIMS SHOULD NOT BE DISMISSED

As demonstrated above, the Complaint states a claim against Veeco, the controlled person, for primary liability under §10(b) of the Exchange Act. ¶¶148-57. In addition, Plaintiff alleges culpable participation with respect to all of the Individual Defendants because Plaintiff has alleged facts giving rise to a strong inference that they acted with scienter. ¶¶158-61. Accordingly, Plaintiff's §20(a) claims should not be dismissed. *See In re Atlas Air*, 324 F. Supp. 2d at 499.

## <u>CONCLUSION</u>

For all of the reasons set forth herein, Defendants' motion to dismiss the Complaint should be denied in its entirety.[16]

---

[16] As demonstrated above, the Complaint states actionable claims under the federal securities laws and amply satisfies all applicable pleading requirements. However, in the event the Court determines that there are any deficiencies in the Complaint, Plaintiff respectfully requests leave to replead. *See* Fed.R.Civ.P. 15(a).

Dated: December 22,  2005                        **BERGER & MONTAGUE, P.C.**

Sherrie R. Savett  (I.D. 17646)
Phyllis M. Parker (I.D. 77336)
Jeffrey L.Osterwise (I.D. 201859)
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875 - 3000
Fax: (215) 875 - 4604
***Lead Counsel for Lead Plaintiff
Steelworkers Pension Trust and the Class***

26