## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------- x
In re VEECO INSTRUMENTS INC.        :        Case No.: 7:05-md-01695 (CM)(GAY)
SECURITIES LITIGATION               :
------------------------------------------------- x
------------------------------------------------- x
THIS DOCUMENT RELATES TO            :
ALL ACTIONS                         :
------------------------------------------------- x
```

### DECLARATION OF CAROLE A. BRODERICK IN SUPPORT OF FINAL APPROVAL OF THE SETTLEMENT, LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND AWARD TO LEAD PLAINTIFF FOR COSTS AND EXPENSES

I, Carole A. Broderick, declare and state, under penalty of perjury, that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a shareholder of Berger & Montague, P.C. ("Berger & Montague"). By Order dated October 12, 2005, the Court appointed Berger & Montague to serve as lead counsel for the Class ("Lead Counsel" or "Lead Plaintiff's Counsel") in the above-captioned action (the "Action").[1] As Lead Counsel, Berger & Montague directed the litigation of this Action on behalf of all purchasers of the common stock of Veeco Instruments, Inc. between April 26, 2004 and February 10, 2005. I have personal knowledge of the matters described below and am competent to testify thereto.

---

[1] Defendants in this Action are Veeco Instruments, Inc. ("Veeco" or the "Company"), Edward H. Braun ("Braun"), John F. Rein, Jr. ("Rein"), John P. Kiernan ("Kiernan") and R. Michael Weiss ("Weiss"). Defendants Braun, Rein, Kiernan and Weiss are collectively referred to as the "Individual Defendants."

2.    I make this Declaration, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, on behalf of Lead Plaintiff Steelworkers Pension Trust ("Lead Plaintiff" or "Steelworkers")in support of (a) Motion for Final Approval of Class Action Settlement and Plan of Allocation and (b) Motion by Lead Plaintiff for an Award of Attorneys' Fees and Reimbursement of Expenses and Reimbursement of Reasonable Costs and Expenses to Lead Plaintiff.  This Declaration provides information about the Action, the Settlement and the services performed by Lead Plaintiff and Lead Counsel that resulted in the Settlement.

3.    The Settlement submitted to the Court for approval represents an outstanding result in a challenging case.  As set forth in greater detail below, the Settlement provides for a cash payment in the total amount of $5,500,000, plus interest (the "Settlement" or the "Settlement Fund"), to compensate members of the Class and to pay attorneys' fees, reimburse expenses and provide for an award to Lead Plaintiff for its representation of the Class as awarded by the Court.  Considering the risks of litigation, this is an excellent result for the Class.

4.    The Settlement was achieved only through the vigorous prosecution of Lead Plaintiff's and the Class' claims by Lead Counsel, after almost two years of contentious, hard-fought litigation and vigorous mediation, which continued over a span of several months, before former United States District Judge Nicholas H. Politan.  Indeed, the initial mediation was conducted only after substantial discovery had occurred, and discussions between the parties through Judge Politan continued as discovery progressed, with a final mediation session occurring after the parties had submitted their final pretrial order.  The Settlement was eventually reached only after discovery was completed, the parties had received the Court's decisions on numerous motions *in limine,* and after the parties had vigorously argued their positions concerning the admissibility of the evidence to be

introduced at trial and the Court had ruled thereon during the final pretrial conference on June 28, 2007. Thus, Lead Plaintiff and Lead Counsel were fully aware of all of the strengths and weaknesses of the case when the parties reached the Settlement.

5.      Specifically, as detailed herein, the Settlement was reached only on the eve of trial after (1) Lead Counsel conducted an extensive investigation of the relevant facts and law; (2) the parties served and responded to comprehensive documents requests; (3) Lead Counsel subpoenaed twenty-six third-parties for documents and testimony (including Veeco's auditor Ernst & Young, Veeco's forensic accountant Jefferson Wells International, Inc., Veeco's suppliers and customers, and investment analysts who covered Veeco during the Class Period); (4) Lead Counsel reviewed and analyzed hundreds of thousand of pages of documents produced by Defendants and third-parties; (5) the parties took and defended fifteen (15) fact and expert depositions (including depositions conducted by Lead Counsel of the Individual Defendants and other key employees and former employees of Veeco, three Ernst & Young partners involved in auditing Veeco's financial statements before and during the Class Period, and Defendants' damages expert, and depositions defended by Lead Counsel of Lead Plaintiff and its asset manager, as well as Lead Plaintiff's testifying experts); (6) Lead Counsel successfully opposed a hard-fought motion to dismiss filed by Defendants; (7) class certification was granted; (8) the parties filed and opposed numerous discovery motions concerning document production, including challenges to the Defendants' assertion of privileges and Defendants' duty to produce electronically stored documents, witness depositions and Defendants' demand for the disclosure of Lead Plaintiff's confidential sources; (9) the parties served and responded to interrogatories and requests for admission; (10) the parties consulted with experts and retained testifying experts on accounting and damages who developed and served detailed expert

3

reports, and testified at depositions defending their reports; (11) the parties engaged in continued settlement negotiations through an experienced mediator, retired Judge Nicholas H. Politan; (12) the parties served and responded to numerous motions *in limine*; and (13) the parties completed substantial preparation for trial, which included (a) filing an pretrial order which identified all exhibits the parties intended to introduce at trial, all witnesses the parties intended to call at trial, designations of all deposition testimony that the parties intended to introduce at trial, the issues to be tried, and a detailed statement of each parties contentions of fact and law; (b) submitting a comprehensive set of proposed jury instructions, voir dire instructions and a verdict form; and (c) participating in a full-day, final pretrial conference, vigorously arguing their positions regarding the admissibility of evidence at trial.

6.    In addition, although Lead Plaintiff had obtained substantial evidence during discovery to support its claims and believed that it could prove its claims against Defendants to a jury, the Settlement was reached after Lead Plaintiff's Counsel had a complete understanding not only of the strengths of its case, but also of the risks of proceeding to trial, including that it was far from certain that a jury would find that any or all of the Defendants were liable or that the jury would find that their level of culpability rose to the level of scienter, there was no alleged insider trading by any Defendants, and no SEC or other governmental agency charging the Company with wrongdoing. Furthermore, Defendants were represented by highly experienced and tenacious counsel who presented Lead Plaintiff with a number of serious obstacles, by filing numerous motions, including a motion to withhold the documents relating to Veeco's internal investigation of the TurboDisc accounting issues that led to the Company's restatement and the motion *in limine* to preclude Lead Plaintiff's damages expert from including certain damages in his calculations. By the

4

time settlement was reached, Lead Plaintiff's Counsel had litigated the Action for nearly two years, without the aid of co-counsel, and had spent hundreds of thousands of dollars in out-of-pocket expenses on merits and expert discovery and pre-trial preparation, with no assurance that Lead Plaintiff would win a judgment at trial, and the prospect that, even if it won, Defendants would appeal, further delaying recovery for the Class. Moreover, even if Lead Plaintiff won, there was no assurance that it would obtain damages beyond the amount of the Settlement.

7.      For the reasons discussed below, the proposed Settlement is fair, reasonable, adequate and in the best interests of the Class. Because the proposed Settlement readily satisfies all relevant legal standards for approval of class action settlements, it should be approved.

8.      In addition, the petition for attorneys' fees in the amount of $1,650,000, plus interest, representing 30% of the Settlement Fund, represents a fair and reasonable percentage of the recovery obtained and should be granted by the Court. As fully set forth in Lead Plaintiff's Memorandum of Law in Support of its Motion for an Award of Attorneys' Fees and Expenses, and Reimbursement of Reasonable Costs and Expenses to Lead Plaintiff for Representation of the Class (the "Fee Memorandum"), the percentage fee requested by Lead Counsel represents a fractional multiplier that falls well below the range of fees awarded in similar class actions. Likewise, reimbursement of the total litigation expense of $774,329.29 and the requested award to Lead Plaintiff are also fair and reasonable and should be approved.

9.      The requested fee in this case not only represents a reasonable percentage of the benefit obtained, but also reasonably reflects the work accomplished by Lead Counsel, especially in light of the fact that Lead Counsel was the sole law firm prosecuting and bearing all of the risk in the case. The services performed by Lead Counsel result in a lodestar of $4,594,233.40. The

requested fee of $1,650,000 thus is far less than Counsel's normal hourly rates, resulting in a

multiplier of .3591 of such rates. As set forth in the accompanying Fee Memorandum, this fractional

multiplier falls well below the range of multipliers approved by courts in the Second Circuit and

reflects that Lead Counsel will not be compensated for nearly two thirds of its lodestar.

10.    Potential members of the Class received two separate notices in this Action. First,

in compliance with the Court's May 15, 2007 Order, Heffler, Radetich & Saitta LLP, the Notice

Administrator designated by Lead Counsel, disseminated a total of 11,392 copies of a Notice of

Pendency of Class Action (the "Notice of Pendency") on June 1, 2007, and published a Summary

Notice of Pendency of Class Action in the national edition of *The Wall Street Journal* on June 8,

2007. In response to this extensive notice procedure, only two members of the Class opted out of

the Action.[2] Second, in compliance with the Court's August 23, 2007 Preliminary Approval Order,

the Notice Administrator disseminated a total of 15,528 copies of a Notices of Proposed Settlement

of Class Action (the "Notice of Settlement") to potential members of the Classes, and a Summary

Notice of Proposed Settlement of Class Action was published in the national edition of *The Wall

Street Journal* on September 19, 2007. *See* attached Affidavit of Edward J. Sincavage, C.P.A.

Regarding Dissemination of Notice to the Class (the "Sincavage Affidavit"). The requested fee is

consistent with the percentage described in the Notice of Settlement sent to all potential members

of the Class. Notably, although 15,528 copies of the Notice of Settlement and Proof of Claim form

---

[2] The Notice of Pendency provided class members with an opportunity to opt-out of the Class by July 6, 2007. As of that date, only two class members opted out. One of the opt-outs, Mr. Harold P. Houser, asserted that he bought Veeco stock on June 7, 2004 at a cost of $2,603.00, and sold on April 27, 2006 for $2,230.73, for a loss of $372.27, without indicating the number of shares bought or sold on those dates. The other, opt-out reported a purchase of 100 shares of Veeco on December 10, 2004, without providing any further information. On September 20, 2007, Mr. Houser opted out following receipt of the Notice of Settlement, but still gave no further information.

were mailed to potential members of the Class, there have been no objections to the Settlement, the Plan of Allocation, Lead Counsel's requested fees and reimbursement of expenses or the requested award for Lead Plaintiff's representation of the Class. Moreover, only one potential member of the Class, who had previously opted out of the Class in response to the Notice of Pendency, has requested to be excluded from the Settlement.

11.     Lastly, the Settlement and requested attorneys' fees have been negotiated with and endorsed by Lead Plaintiff Steelworkers Pension Trust, which is a sophisticated institutional investor that has firsthand knowledge of the strengths and weaknesses of its claims, including the risks of litigation and the chances of obtaining a recovery larger than the Settlement in light of the risks associated with a trial. Moreover, as set forth is the accompanying Declaration of Richard S. Hoffmann, Esq., General Counsel for Steelworkers Pension Trust, Steelworkers Pension Trust directly monitored Lead Counsel's efforts to obtain the recovery for the Class and has approved both the Settlement and Lead Counsel's fees. *See* Declaration of Richard S. Hoffmann, Esq., General Counsel of Lead Plaintiff Steelworkers Pension Trust in Support of an Award to Steelworkers for Reimbursement of Reasonable Costs and Expenses Incurred in Representation of the Class and in Support of Final Approval of the Settlement and of Lead Counsel's Application for Attorneys' Fees (the "Hoffmann Declaration").

12.     In light of the foregoing, the proposed Settlement is an outstanding result worthy of final approval by the Court, and that the requested fee and expense award, and the award to Lead Plaintiff for its representation of the Class, should be granted, as more fully explained in Lead Plaintiff's Memorandum of Law in Support of its Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Memorandum") and the Fee Memorandum.

## I.    BACKGROUND AND HISTORY OF THE LITIGATION

### A.    History of the Proceedings

13.    Veeco Instruments Inc. ("Veeco") is a company that, during the Class Period, manufactured, marketed and serviced a line of equipment primarily used by manufacturers in the data storage, semiconductor, compound semiconductor/wireless and high-brightness light emitting diode ("LED") industries. This action was brought against Veeco; Edward H. Braun, Veeco's Chairman of the Board and Chief Executive Officer during the relevant time period; John F. Rein, Jr., Veeco's Executive Vice President and Chief Financial Officer; John P. Kiernan, Veeco's Vice President of Finance and Corporate Controller and R. Michael Weiss, Vice President and General Manager of Veeco's Asia/Pacific region.

14.    On February 11, 2005, before the market opened, Veeco announced that it would postpone the release of audited results for the 2004 fourth quarter and full year pending completion of an internal investigation of improper accounting transactions at its TurboDisc division which Veeco had acquired from Emcore in November 2003. The Company also stated that it expected that the investigation would lead to adjustments requiring the restatement of the financial statements previously issued for the quarterly periods and nine months ended September 2004, with an expected pre-tax earnings impact between $5.5 million and $7.5 million for the nine months ended September 30, 2004. This news shocked the market and the price of Veeco's publicly traded stock dropped by more than 10%.

15.    The Action was commenced on February 15, 2005 by the filing of a complaint in the Southern District of New York captioned *L.I.S.T., Inc. v. Veeco Instruments Inc.*, Edward H. Braun

8

and John F. Rein, Jr., C.A. No. 7:05-2189.  Additional complaints were filed thereafter in both the

Eastern District of New York and the Southern District of New York.  The cases filed in the Eastern

District of New York were:

> *McIntosh v. Veeco Instruments Inc.*, et al., C.A. No. 2:05-889;
>
> *Linzer v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-957;
>
> *Kantor v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-967;
>
> *Walker v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1003;
>
> *Collins v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1277;
>
> *Holthuizen v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1337;
>
> *Vogt v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1430; and
>
> *Grove v. Veeco Instruments Inc., et al.*, C.A. No. 2:05-1552.

The cases filed in the Southern District of New York were:

> *L.I.S.T., Inc. v. Veeco Instruments Inc.*, et al., C.A. No. 7:05-2189; and
>
> *Kershaw v. Veeco Instruments Inc., et al.*, C.A. No. 7:05-2929

16.     On April 18, 2005, Lead Plaintiff Steelworkers Pension Trust ("Lead Plaintiff" or

"Steelworkers") filed its motion for consolidation, for its appointment as lead plaintiff on behalf of

the Class and for approval of Lead Plaintiff's selection of Lead Counsel and Liaison Counsel in the

Eastern District of New York.  On the same day, Lead Plaintiff filed a notice in the Southern District

of New York, incorporating its motion filed in the Eastern District of New York.

17.     On May 2, 2005, Lead Plaintiff filed a memorandum of law in further support of its

motion for appointment as lead plaintiff and in opposition to the competing motions of other

members of the Class for appointment as lead plaintiff.  On May 12, 2005, Lead Plaintiff filed a

reply memorandum of law in further support of its motion for appointment as lead plaintiff and in

opposition to the competing motions filed by Ratan LalChandani and NECA-IBEW Pension Fund.

18.    By Order of the Honorable William Terrell Hodges on behalf of the Judicial Panel

on Multidistrict Litigation dated August 22, 2005, all of the cases then filed in the Eastern District

of New York were transferred to the Southern District of New York and assigned to the Honorable

Colleen McMahon for coordinated or consolidated pretrial proceedings with the cases then filed in

the Southern District of New York.

19.    By Order dated October 12, 2005, the Court appointed Steelworkers Pension Trust

as Lead Plaintiff and Berger & Montague, P.C. as Lead Counsel for the Class, declining to appoint

liaison counsel in the Action.

**B.    Consolidated Complaint, The Motion To Dismiss and Defendants' Answer**

20.    On November 7, 2005 Lead Plaintiff filed its Consolidated Amended Class Action

Complaint (the "Complaint"), which superseded all prior complaints filed in the Action and alleged

claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5

promulgated thereunder, as amended by the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4 et seq. The Complaint contained additional supporting allegations

for the claims asserted in the initial class actions, as well as new claims. The Complaint alleged a

Class that included all purchasers of Veeco securities between Nov. 3, 2003 and February 10, 2005.[3]

Defendants named in the Complaint were Veeco, Edward H. Braun, John F. Rein, Jr., John P.

---

[3] As explained herein, the length of the putative Class Period was heavily contested and
challenged by Defendants. As a result of Defendants' opposition to Lead Plaintiff's Motion for
Class Certification, the Class Period was shortened by the Court to begin on April 26, 2004. *See*
Section I.C.

Kiernan and R. Michael Weiss[4]. Defendants Kiernan and Weiss had not been named as defendants in the earlier filed complaints.

21.    In the Complaint, Lead Plaintiff alleged that Defendants artificially inflated the value of Veeco securities during the period from November 3, 2003 through February 10, 2005. The Complaint had extremely detailed allegations about Veeco, its TurboDisc business and the statements alleged to be false. Specifically, the Complaint alleged that Veeco's financial statements, which the Company was forced to restate, and Defendants' other public statements during the Class Period, overstated Veeco's pre-tax earnings by $10.2 million and concealed the unprofitability and true profit margins and accounting improprieties of Veeco's TurboDisc business, and that Defendants' public statements concealed the fact that TurboDisc had deficient or absent financial controls and that Veeco's financial statements could not be relied on by the investing public. The Complaint also alleged that Defendants concealed these facts, and failed to correct prior false statements made to the public, during the Class Period, and that these facts were first disclosed to the public on the morning of February 11, 2005, and that upon the announcement of this previously undisclosed adverse material information, the price of Veeco stock dropped by more than 10%.

22.    Defendants moved to dismiss the Complaint on December 2, 2005. Defendants asserted that Lead Plaintiff failed to state a claim under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and that Lead Plaintiff failed to plead fraud with particularity as required

---

[4] At the time of the filing of the Complaint, Defendant Weiss was located in Singapore and Defendants' counsel was not willing to accept service of the Complaint on behalf of Defendant Weiss. Lead Plaintiff sought the Court's assistance to issue Letters Rogatory to serve Mr. Weiss with the Complaint. The Court signed Lead Plaintiff's application for Letters Rogatory on May 19, 2006. As July 5, 2007, the date upon which the parties signed the Memorandum of Understanding to settle this Action, Lead Plaintiff had not received any confirmation that Mr. Weiss had been served with the Complaint.

under Fed. R. Civ. P. 9(b) and the PSLRA. Specifically, Defendants argued, *inter alia*, that many

of the false statements about Veeco's TurboDisc division alleged by Lead Plaintiff were simply

optimistic statements, forward-looking statements and opinions that were not actionable, that Lead

Plaintiff had merely alleged mismanagement on the part of Defendants which was not sufficient to

form the basis of a claim against Defendants, that Lead Plaintiff had essentially alleged fraud by

hindsight through which Lead Plaintiff had failed to sufficiently allege scienter, that Lead Plaintiff

had failed to identify any motive on the part of Defendants to commit fraud and had therefore failed

to plead scienter, and that Plaintiff had failed to identify specific facts that would establish conscious

misbehavior or recklessness on the part of Defendants. In addition, Defendants argued Lead

Plaintiff's Complaint contained insufficient allegations with respect to loss causation under *Dura*

*Pharm. v. Broudo*, 544 U.S. 336 (2005).

23.     On December 22, 2005, Lead Plaintiff responded to Defendants' motion to dismiss

the Complaint. Lead Plaintiff argued that Veeco's restatement of its financial statements for the first

three quarters of 2005 demonstrated the materiality of Veeco's mistatements and that Veeco's

quarterly financial statements were false and misleading when issued. Lead Plaintiff also argued that

Defendants' misstatements did not come within any safe harbor defense. Further, Lead Plaintiff

asserted that the Complaint sufficiently plead scienter by alleging direct evidence provided by Lead

Plaintiff's Confidential Witnesses.

24.     Following briefing on the Defendants' motion to dismiss the Complaint, in a March

21, 2006 Order and Decision, the Court denied Defendants' motion to dismiss. Specifically, the

Court concluded that Lead Plaintiff had pled its allegations of securities fraud with the requisite

particularity under Fed. R. Civ. P. 9(b) and the PSLRA, noting that Lead Plaintiff had identified

nearly a dozen statements by Defendants during that Class Period which allegedly contained misrepresentations or omissions, and that each statements was sufficiently identified and described in detail as to why it was fraudulent.    In addition, the Court concluded that Lead Plaintiff had sufficiently described the three confidential witnesses identified in the Complaint. Furthermore, the Court found that the Complaint contained sufficient allegations of Defendants' conscious misbehavior or reckless to adequately plead scienter by alleging that Defendants had knowledge of or ignored a series of accounting improprieties at Veeco, including knowingly or recklessly recognizing revenue prematurely, knowingly or recklessly ignoring a dramatic increase in warranty costs at the TurboDisc division, and knowingly or recklessly ignoring a rise in the level of Veeco's inventory.    The Court also found that allegations of Veeco's restatement constituted strong circumstantial evidence of scienter, and that Lead Plaintiff's allegations that Defendants ignored red flags regarding Veeco's internal accounting control constituted strong evidence of recklessness. Finally, the Court determined that Lead Plaintiff had sufficiently pleaded loss causation, that the majority of Defendants' false statements were not protected by any safe harbor and that Lead Plaintiff had sufficiently pleaded control person liability under Section 20(a).  The Court concluded that Defendants' November 3, 2003 statements concerning Veeco's acquisition of the TurboDisc division from Emcore Corp. and Defendants' statements in and relating to Veeco's 2003 Form 10-K filed March 12, 2004 were not actionable because they were accompanied by meaningful cautionary statements such that they were protected by the bespeaks caution doctrine and the PSLRA's safe harbor provision.  The Court's decision was published at: *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006).

25.    On April 5, 2006, Defendants moved the Court for partial reconsideration of its March 21, 2006 Order and Decision denying Defendants' motion to dismiss the Complaint, arguing that the Court had overlooked Defendants' arguments relating to Veeco's contract with its customer Sanan and Defendants' arguments relating to the increase in Veeco's inventory and that the Court had erred in assessing Lead Plaintiff's scienter allegations under the group pleading doctrine. The Court instructed Lead Plaintiff not to respond to Defendants' motion for partial reconsideration, and, by Order dated April 12, 2006, the Court denied Defendants' motion for partial reconsideration.

26.    On April 10, 2006, Defendants' filed their Answer to the Complaint. Defendants denied the substantive allegations of the Complaint and asserted twenty (20) affirmative and other defenses.

**C.    Class Certification**

27.    On November 7, 2005, the same date on which Lead Plaintiff filed the Complaint, Lead Plaintiff filed a motion seeking an order certifying the Action as a class action under Fed. R. Civ. P. 23. Lead Plaintiff's motion sought to certify a class consisting of all persons who purchased the securities of Veeco during the period from November 3, 2003 and February 10, 2005, inclusive, and were damaged thereby. Excluded from the proposed Class were Defendants, members of the immediate families of the Individual Defendants, any parent, subsidiary, affiliate, officer or director of Defendant Veeco, any entity in which any excluded person had a controlling interest and the legal representatives, heirs, successors and assigns of any excluded person. Lead Plaintiff's motion also sought an order certifying Lead Plaintiff Steelworkers as Class Representative and appointing Lead Plaintiff's Counsel as Class Counsel.

14

28.     On November 30, 2005, Defendants served a notice of subpoena for oral deposition of a designee of Fox Asset Management, LLC, ("Fox Asset Management") Lead Plaintiff's asset manager, seeking testimony and production of documents concerning, *inter alia,* Steelworkers' investments in Veeco. In response to Defendants' subpoena, Lead Plaintiff's counsel reviewed and produced responsive documents to Defendants, and on December 15, 2005, Fox Asset Management, by its representative William Dodge, was deposed by Defendants by telephone.

29.     On December 5, 2005, Defendants served a notice of deposition for the designee of Lead Plaintiff Steelworkers Pension Trust. On December 8, 2005, Steelworkers Pension Trust, by its representative Richard S. Hoffman, Esq., General Counsel of Steelworkers Pension Trust, was deposed by Defendants.

30.     On December 19, 2005, Defendants filed a memorandum on law in support of their opposition to Lead Plaintiff's motion for class certification. Defendants asserted that Lead Plaintiff's asset manager, Fox Asset Management, was solely responsible for Lead Plaintiff's purchases of Veeco stock during the Class Period, and thus Lead Plaintiff was subject to unique defenses based on an apparent lack of reliance and was therefore atypical of the Class; that Lead Plaintiff was not sufficiently knowledgeable about the action; and that Lead Plaintiff was not prepared to assume the costs of litigation, therefore, Lead Plaintiff was not an adequate representative of the Class. Finally, Defendants contended that, if the action were to proceed, the Court should limit the class period to the period from April 26, 2004 through February 10, 2005.

31.     On January 10, 2006, Lead Plaintiff filed a reply memorandum in further support of its motion for class certification, arguing, *inter alia,* that Lead Plaintiff's reliance on sophisticated investment professionals to make investments decisions in individual stocks did not render Lead

Plaintiff atypical of the Class; this practice was in accordance with its fiduciary duties to its

beneficiaries and was consistent with the law and usual practice of public pension funds. In addition,

Lead Plaintiff argued that Defendants' attacks upon Lead Plaintiff's adequacy were without basis

in fact or law and that Defendants' attempt to shorten the Class Period should be denied.

32.    On March 21, 2006 the Court issued an Order and Decision in which the Court

granted Lead Plaintiff's motion for class certification (i) finding that the Action should be maintained

as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class

consisting of all Persons who purchased the securities of Veeco Instruments Inc., during the period

between April 26, 2004 and February 10, 2005 inclusive and were damaged as a result thereof,

excluding from the class Defendants, members of the immediate family of each of the individual

Defendants, any parent, subsidiary, affiliate, officer or director of Veeco, any entity in which any

excluded person has a controlling interest, and the legal representatives, heirs, successors, and

assigns of any excluded person[5]; (ii) certifying Steelworkers Pension Trust as class representative

pursuant to Rule 23; and (iii) appointing Berger & Montague, P.C. as class counsel pursuant to Rule

23. Finally, having already determined that the Defendants' alleged false statements prior to April

26, 2004 were protected under the bespeaks caution doctrine and safe harbor provision of the

PSLRA, the Court accepted Defendants' argument that the Class Period should be shortened. *See*

*In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220 (S.D.N.Y. 2006).

---

[5] In its August 23, 2007 Order preliminarily approving the settlement of this Action, the Court subsequently redefined the definition of the Class as all persons who purchased the securities of Veeco during the period between April 26, 2004 and February 10, 2005, inclusive, excluding from the class Defendants, members of the immediate family of each of the individual Defendants, any parent, subsidiary, affiliate, officer or director of Veeco, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any excluded person.

**D.      The Pretrial Schedule**

33.      Following the Court's March 21, 2006 Order and Decision denying Defendants'

motion to dismiss the Complaint and granting Lead Plaintiff's motion for class certification, the

parties negotiated a pretrial schedule and submitted a stipulated schedule to the Court.  On April 5,

2006, the Court approved the parties' joint stipulation and order setting the pretrial schedule.  The

schedule called for, *inter alia,* the parties to exchange Initial Disclosures required under Fed. R. Civ.

P. 26(a)(1) by April 14, 2006, for document production to be completed by July 31, 2006, for all fact

discovery to be completed by October 27, 2006 and for all expert discovery to be completed by

December 22, 2006.  Lead Plaintiff served its Initial Disclosures on April 10, 2006 and Defendants

served their Initial Disclosures on April 14, 2006.

34.      Following discussion and negotiation between the parties, on July 27, 2006, the

parties wrote a letter informing the Court that the parties had scheduled a mediation before retired

Judge Nicholas H. Politan on October 11-12, 2006.  In light of this upcoming mediation, the parties

requested an amended pretrial schedule to increase the likelihood of a successful mediation, allowing

the parties sufficient time to analyze the document productions and prepare written mediation

statements prior to the mediation.  The parties requested that the document production deadline be

extended to August 21, 2006, the fact discovery deadline to be extended to January 31, 2007 and the

expert discovery deadline to be extended to March 23, 2007.  The Court granted this request on July

28, 2006.

35.      Due to outstanding discovery issues near the end of the fact discovery deadline, the

parties requested an amendment of the pretrial order extending the fact discovery deadline to

17

February 28, 2007, with certain exceptions for outstanding discovery issues, and extending the expert discovery deadline to April 23, 2007. The Court approved this request on January 26, 2007.

36.     During a pretrial conference before the Court on February 23, 2007 and through a related Order, the Court set a trial date of July 9, 2007, with Lead Plaintiff to designate its experts by March 23, 2007, Defendants to designate their experts by April 20, 2007, all discovery to be completed by May 11, 2007 and all final pretrial papers and motions *in limine* to be submitted to the Court by June 1, 2007.

37.     On March 22, 2007, Lead Plaintiff requested a limited amendment to the pretrial schedule, permitting Lead Plaintiff to designate an accounting expert by April 20, 2007 and Defendants to designate an accounting expert by May 9, 2007, without otherwise altering the pretrial schedule. The Court approved this request on March 26, 2007.

**E.      Fact Discovery**

38.     The parties engaged in extensive fact discovery that was completed at the time the proposed settlement was reached. First, on April 6, 2006, Lead Plaintiff served Defendants with its first requests for production of documents. Defendants served their responses and objections to Lead Plaintiff's first requests for production of documents on May 9, 2006.

39.     Before Defendants would agree to produce documents, Defendants demanded that disclosure of the documents be restricted by Order of the Court. As a result, the parties negotiated and drafted a stipulated protective order governing the production and use of confidential materials (the "Protective Order"). The Court approved the Protective Order on May 16, 2006.

40.     On May 31, 2006, Defendants began a rolling production of documents and continued to produce documents through August 21, 2006, with the largest volume of those documents being

18

produced toward the end of that time period. In addition, as discussed more fully below, on April 25, 2007, Defendants began a rolling production of documents recovered from Veeco's backup tapes pursuant to an Order of the Court granting Lead Plaintiff's motion to compel electronically stored documents. In total, Defendants produced approximately 225,000 pages of documents on multiple compact discs.

41.    Lead Plaintiff served several additional document requests, including requests on December 29, 2006, January 1, 2007 and April 11, 2007. However, Defendants objected to the additional document requests as untimely under the Court's pretrial scheduling order.

42.    On July 31, 2006, Defendants served their first request for production of documents on Lead Plaintiff. Lead Plaintiff served its responses and objections to Defendants' first request for production of documents on August 30, 2006, and, thereafter, produced responsive documents to Defendants.

43.    In addition to document discovery, the parties served and responded to numerous interrogatories and requests for admission. Lead Plaintiff served four sets of interrogatories and one set of requests for admission on Defendants between August 2, 2006 and April 11, 2007. Defendants served one set of interrogatories on September 21, 2006 and one set of requests for admission on April 11, 2007.

44.    During the course of discovery, Lead Plaintiff reviewed documents subpoenaed from about twenty-six (26) third-parties, including Veeco's auditor Ernst & Young, several of Veeco's customers and suppliers, TurboDisc's former owner Emcore, and securities analysts who covered Veeco during the Class Period. More than 10,000 pages of documents were received from these third-parties.

19

45.     Lead Plaintiff's Counsel also deposed the key party and non-party witnesses, including three of the Individual Defendants, other key Veeco employees and former employees, Veeco's outside auditor Ernst & Young and Veeco's forensic accountant Jefferson Wells International, Inc. Specifically, Lead Plaintiff conducted the following depositions that are listed below in chronological order:

a.     on December 19, 2006, Lead Plaintiff's Counsel deposed Herman Birnbaum, a former Veeco employee and special projects internal auditor who examined accounting errors at Veeco's TurboDisc division;

b.     on January 10, 2007, Lead Plaintiff's Counsel deposed Thomas Vollmer, manager of Jefferson Wells International, Inc., Veeco's forensic accountant, the engagement team which examined the accounting errors at Veeco's TurboDisc Division and issued a report;

c.     on February 9, 2007, Lead Plaintiff's Counsel deposed Bruce Huff, a former Veeco employee who acted as division controller of Veeco's TurboDisc division during the Class Period and whom the Company publicly blamed for the accounting errors at TurboDisc;

d.     on February 13, 2007, Lead Plaintiff's Counsel deposed Gary Reifert, Veeco's internal auditor during the Class Period;

e.     on February 20, 2007, Lead Plaintiff's Counsel deposed Alex Fredericks, the Ernst & Young engagement partner in charge of the audit of Veeco's 2004 financial statements;

f.     on February 23, 2007, Lead Plaintiff's Counsel deposed Defendant Edward H. Braun, Veeco's Chairman of the Board and Chief Executive Officer during the relevant time period;

g.     on February 27, 2007, Lead Plaintiff's Counsel deposed Defendant John P. Kiernan, Veeco's Vice President of Finance and Corporate Controller;

h.     On February 28, 2007, Lead Plaintiff's Counsel deposed Defendant John F. Rein, Jr., Veeco's Executive Vice President and Chief Financial Officer;

i.      on April 18, 2007, Lead Plaintiff's Counsel deposed David Bonagura, the Ernst & Young partner in charge of the Veeco audits for the six years ending with the audit of Veeco's 2003 financial statements; and

j.      on May 17, 2007, Lead Plaintiff's Counsel deposed Steven C. Amato, the Ernst & Young partner in charge of the Veeco account for 2004 and the first quarter of 2005.

**F.**    **Expert Discovery**

46.    Throughout the litigation, Lead Plaintiff retained and consulted with experts on accounting and damages issues. Following fact discovery, the parties exchanged the reports of the damages and accounting experts and deposed their respective experts.

47.    Lead Plaintiff's testifying experts included:

a.      <u>Steven P. Feinstein, Ph.D, CFA</u>. Lead Plaintiffs' damages expert opined on damages and loss causation. Dr. Feinstein provided an expert report on March 23, 2007 and testified at a deposition on June 8, 2007, which was defended by Lead Plaintiff's Counsel, opining that: (1) based on an event study focusing on the market's reaction to Veeco's February 11, 2005 announcement that the Company would restate earnings for the previous three quarters, in which the Company also estimated the magnitude of the restatement, the Company's misrepresentations relating to earnings over the previous three quarters had caused the price of Veeco stock to be artificially inflated during the Class Period; (2) the Company's corrective disclosure before the market opened on February 11, 2005 caused the market price of Veeco's stock to decline; and (3) members of the Class suffered damages as a result of Veeco's false and misleading statements during the Class Period.

b.      <u>Robert E. Berliner, CPA, CFE</u>. Lead Plaintiff's accounting expert opined on accounting issues and issues of liability and scienter. Mr. Berliner provided an expert report on April

11, 2007 opining that: (1) the conduct of Defendants during the Class Period was reckless in that it was highly unreasonable and represented and extreme departure from the standards of ordinary care in: (a) issuing financial statements for each of the first three quarters of 2004 that failed to fairly present, in all material respects, Veeco's financial condition, results of operations and cash flows, (b) failing, on a timely basis, to disclose publicly that Veeco's financial statements could no longer be relied upon and to restate such financial statements, and (c) misstating sales and gross margins of Veeco and its TurboDisc division in Management's Discussion and Analysis of Financial Conditions and Results of Operations in Veeco's Forms 10-Q for each of the first three quarters of 2004; and (2) Individual Defendants Braun and Rein were reckless in providing false certifications about Veeco's financial statements and other financial information, Veeco's disclosure controls and procedures, and its internal control over financial reporting in each of Veeco's Forms 10-Q for each of the first three quarters of 2004. In addition, following a review of documents produced by Defendants' which were recovered from Veeco's backup tapes, Mr. Berliner provided a supplement to his expert report and addressed the following matters: (1) accounting errors identified prior to Veeco's filing of its Form 10-Q for the period ended September 30, 2004; (2) Defendants' awareness of the shortcomings of the TurboDisc division controllers' integrity and competency; (3) Defendants' knowledge that Veeco's financial statements were materially misstated prior to the initiation of Veeco's internal investigation in January 2005; (4) Defendants' failure to disclose Veeco's true financial reporting periods; and (5) Veeco's improper revenue recognition during the Class Period. Mr. Berliner testified at a deposition on June 19, 2007, which was defended by Lead Plaintiff's Counsel.

22

48.     Defendants testifying experts included Vinita M. Juneja, Ph.D, who provided an

expert report on April 20, 2007 and testified at a deposition on June 22, 2007, opining on issues of

damages and loss causation and Gary J. Levin, who provided an expert report on May 9, 2007,

opining on accounting issues and issues of liability

### G.     Motion Practice

49.     Numerous "meet and confer" telephone conferences were held by the parties spanning

from May 2006 through June 2007, and numerous letters and emails were exchanged between the

parties, through which the parties discussed the responses and objections to the parties' discovery

requests and attempted to resolve disputed issues. However, the parties were unable to agree on a

number of discovery issues throughout the course of the litigation and Lead Plaintiff was required

to file many motions to attempt to obtain the documents it regarded as relevant and essential to win

their case, resulting in substantial motion practice, letters to the Court and numerous teleconferences

with, and hearings before, the Magistrate Judge and the Court. A number of these motions involved

important discovery issues such as the Defendants' assertions of privilege over documents, the

disclosure of confidential sources, the timing of interrogatories, the scheduling of depositions and

the restoration of backup tapes, including the following motions:

### 1.     Lead Plaintiff's Motion to Compel Production of Documents Related to Veeco's Internal Investigation of the Accounting Errors as TurboDisc

50.     On August 21, 2006, Lead Plaintiff filed a motion pursuant to Fed. R. Civ. P. 37(a)

to compel documents created or prepared by Veeco, Jefferson Wells International, Inc., Veeco's

outside counsel Kaye Scholer LLP or Ernst & Young LLP in connection with the investigation of

TurboDisc accounting and the restatement of Veeco's financial statements for the first, second and

third quarters of 2004 (the "internal investigation documents") which Defendants had withheld from discovery on the grounds of the attorney-client privilege and work product doctrine. Lead Plaintiff asserted that (1) neither the attorney-client privilege nor the work product doctrine was applicable to these documents; (2) Defendants, as a result of their actions, had waived any applicable attorney-client privilege or work product protection as to these documents; and (3) even if the documents were protected under the work product doctrine, Lead Plaintiff had a substantial need for the documents and was unable to obtain a substantial equivalent without undue hardship.

51.     On August 23, 2006, the Court ordered the Action referred to Magistrate Judge George A. Yanthis for general pretrial purposes.

52.     On August 25, 2006, Defendants filed a memorandum of law in opposition to Lead Plaintiff's motion to compel, arguing that the documents sought through Lead Plaintiff's motion were protected from discovery, that Defendants had not waived the protection and that Lead Plaintiff had failed to demonstrate a substantial need for the documents. On August 28, 2006 Lead Plaintiff filed a reply memorandum in further support of its motion, and on August 29, 2006 Defendants' sent a surreply letter to the Magistrate Judge.

53.     On September 15, 2006, the parties argued their positions concerning Lead Plaintiff's motion before the Magistrate Judge. The Magistrate Judge reserved his decision and scheduled a pretrial conference for January 11, 2007 for the purpose of discussing outstanding issues before the end of fact discovery. The parties again argued their positions before the Magistrate Judge on January 11, 2007. On January 24, 2007, the Magistrate Judge issued an order denying Lead Plaintiff's motion to compel, finding that the documents sought were protected by the work product

24

doctrine, that Defendants had not waived their work product protection and that Lead Plaintiff did not have a substantial need for the documents.

54.     On February 9, 2007, Lead Plaintiff filed a motion with the District Court, pursuant to Fed. R. Civ. P. 72(a) to vacate and reverse the January 24, 2007 order of the Magistrate Judge denying Lead Plaintiff's motion to compel on the grounds that the Magistrate Judge's ruling was contrary to controlling precedent in the Second Circuit and that it was clearly erroneous.

55.     On February 21, 2007, Defendants filed a memorandum of law in opposition to Lead Plaintiff's motion to vacate and reverse the January 24, 2007 order of the Magistrate Judge denying Lead Plaintiff's motion to compel. On February 28, 2007, Lead Plaintiff filed a reply memorandum in further support of its motion, and, on March 5, 2007, Defendants filed a surreply memorandum in further opposition to Lead Plaintiff's motion.

56.     On March 9, 2007, the Court issued a Decision and Order denying Lead Plaintiff's motion to vacate and reverse the January 24, 2007 order of the Magistrate Judge denying Lead Plaintiff's motion to compel, on the basis that the Magistrate Judge had applied the correct legal standard and that his findings of fact were supported by competent evidence and were not clearly erroneous.

57.     On March 23, 2007, Lead Plaintiff filed a motion for partial reconsideration of the Court's March 9, 2007 Decision and Order denying Lead Plaintiff's motion to vacate and reverse the January 24, 2007 order of the Magistrate Judge denying Lead Plaintiff's motion to compel production of the internal investigation documents. In support of its motion, Lead Plaintiff relied on, *inter alia*, evidence obtained through the depositions on several key witnesses in late February 2007.

58.    On March 28, 2007, the Court instructed Defendants to file a response to Lead

Plaintiff's motion for reconsideration and set a hearing for April 4, 2007.  On April 2, 2007

Defendants filed a memorandum of law in opposition to Lead Plaintiff's motion for reconsideration.

On April 4, 2007, the parties appeared before the Court to argue their positions concerning Lead

Plaintiff's motion for reconsideration.  During the April 4, 2007, the Court denied Lead Plaintiff's

motion for reconsideration on the basis that Lead Plaintiff had not presented new evidence.

### 2.    Defendants' Motion to Compel Lead Plaintiff's Responses to Interrogatories

59.    On January 4, 2007, Defendants sent a motion to the Magistrate Judge in the form

of a letter arguing that Lead Plaintiff should be compelled to respond more completely to

Defendants' first set of interrogatories directed to Lead Plaintiff.  Defendants' interrogatories sought

the identification of the confidential witnesses referred to in the Complaint as well as information

concerning Lead Plaintiff's contentions concerning allegations in the Complaint and concerning loss

causation and its claim for damages.  Defendants argued, contrary to the objections of Lead Plaintiff,

that the identities of the confidential witnesses in the Complaint were not protected by the work

product doctrine and that Defendants' interrogatories concerning Lead Plaintiff's contentions were

not premature contention interrogatories.

60.    During the January 11, 2007 pretrial conference, the Magistrate Judge instructed the

parties to treat Defendants' January 4, 2007 letter as a motion and instructed Lead Plaintiff to submit

a response.  Lead Plaintiff responded to Defendants' January 4, 2007 letter to the Magistrate Judge

through a letter to the Magistrate Judge sent on January 18, 2007.  Lead Plaintiff argued that the

information sought by Defendants' interrogatories requesting the identification of Lead Plaintiff's

confidential witnesses was protected from discovery by the work product doctrine. In addition, Lead Plaintiff asserted that the Defendant's interrogatories concerning Lead Plaintiffs' contentions were premature contention interrogatories which Lead Plaintiff should not be required to answer until the close of discovery. Finally, Lead Plaintiff asserted that Defendants' interrogatories concerning damages and loss causation were premature as expert discovery had not yet been conducted.

61.    On January 26, 2007, the Magistrate Judge issued a decision and order granting in part and denying in part Defendants' motion to compel more complete interrogatory answers. The Magistrate Judge denied Defendants' motion as it pertained to the interrogatories concerning Lead Plaintiff's confidential witnesses, finding that the information sought was protected by the work product doctrine and that Defendants' did not have a substantial need for the information. However, the Magistrate Judge granted Defendants' motion as it pertained to the interrogatories concerning Lead Plaintiff's contentions and claim, finding that Defendants' interrogatories concerning Lead Plaintiff's contentions were not contention interrogatories, and therefore not premature, and that Lead Plaintiff was required to respond to Defendants' interrogatories concerning damages and loss causation with the information presently available with the right to supplement the responses after expert discovery had been conducted.

62.    On February 9, 2007, Lead Plaintiff filed a motion to vacate and reverse, in part, the Magistrate Judge's January 26, 2007 decision and order as it pertained to Defendants' interrogatories concerning Lead Plaintiff's contentions, and claim for damages and loss causation.

63.    Defendants filed a memorandum of law in response to Lead Plaintiff's motion on February 21, 2007. During a pretrial conference on February 23, 2007 before both the Magistrate

27

Judge and the District Court Judge, the Court upheld the Magistrate Judge's January 26, 2007 decision and order, denying Lead Plaintiff's motion.

### 3. Defendants' Motion to Prohibit Lead Plaintiff from Deposing Bruce Huff

64.    On January 8, 2007, Defendants submitted a letter to the Magistrate Judge in an attempt to block Lead Plaintiff from deposing Bruce Huff, TurboDisc division controller during the Class Period, who had been subpoenaed for deposition by Lead Plaintiff, on the ground that Mr. Huff had previously been deposed by Defendants and Lead Plaintiff's Counsel had been offered an hour or two during that deposition to question Mr. Huff, and that Mr. Huff would have to use his limited vacation and sick time for the deposition.

65.    On January 10, 2007, Lead Plaintiff submitted a letter to the Magistrate Judge asserting that Lead Plaintiff should be entitled to depose Mr. Huff, and that Defendants lacked standing to interpose objections to discovery on behalf of Mr. Huff while denying that he was represented by Defendants' counsel. The parties argued their positions before the Magistrate Judge during the pretrial conference on January 11, 2007. On January 23, 2007, the Magistrate Judge issued an order granting Lead Plaintiff permission to depose Mr. Huff.

### 4. Lead Plaintiff's Motion to Compel Defendants to Produce Responsive Documents From Veeco's Backup Tapes

66.    During the February 23, 2007 pretrial conference, Lead Plaintiff raised the issue that Defendants had not searched Veeco's backup tapes when producing documents responsive to Lead Plaintiff's first request for the production of documents. The Court instructed Lead Plaintiff to make a motion to compel Defendants to produce responsive documents, including documents from Veeco's backup tapes. On February 28, 2007, Lead Plaintiff filed a motion to compel, arguing that

Defendants had a duty to search Veeco's backup tapes when responding to Lead Plaintiff's document requests, and that Defendants should be compelled to conduct such a search at their own cost and produce responsive documents.

67.    On March 5, 2007, Defendants filed a memorandum of law in opposition to Lead Plaintiff's motion to compel Defendants to search Veeco's backup tapes and produce responsive documents. In opposition to Lead Plaintiff's motion, Defendants argued that Lead Plaintiff's motion was untimely and prejudicial, that Veeco's backup tapes were not readily accessible and that Lead Plaintiff had not demonstrated good cause for ordering Defendants to restore and search Veeco's backup tapes, and, that if the Court were to compel Defendants to restore and search the backup tapes, the cost of such work should be shifted to Lead Plaintiff.

68.    On March 6, 2007, Lead Plaintiff filed a reply memorandum of law in further support of its motion in which Lead Plaintiff provided additional detail to describe its substantial need for the documents stored on Veeco's backup tapes. In addition, Lead Plaintiff limited the scope of the backup tapes that it sought to be restored. As a result, Lead Plaintiff argued that the cost of restoring and searching this limited set of backup tapes would not impose an undue burden on Defendants, and, accordingly, Defendants should be responsible for the cost of this work.

69.    On March 30, 2007, the Magistrate Judge issued a decision and order granting Lead Plaintiff's motion to compel Defendants to conduct a limited search of Veeco's backup tapes as requested by Lead Plaintiff and produce documents responsive to that search, finding that Lead Plaintiff had demonstrated good cause for the documents requested. In addition, the Magistrate Judge ruled that Defendants should be initially responsible for the costs of this work.

70.    Thereafter, the parties continued to meet and confer concerning Defendants'
production of documents contained on Veeco's backup tapes. Defendants indicated that they
intended to identify responsive documents by searching the documents electronically using a set of
search terms, while Lead Plaintiff contended that Defendants should not be permitted to use search
terms to identify responsive documents. Thus, Lead Plaintiff sent a letter to the Magistrate Judge
on April 24, 2007 requesting permission to file a motion to compel Defendants to conduct a
document-by-document review of the documents on Veeco's backup tapes. On April 26, 2007,
Defendants submitted a letter to the Magistrate Judge in response to Lead Plaintiff's request to file
a motion in which Defendants asserted that the use of search terms was proper and including a list
of search terms that were used. During a telephone conference with the Magistrate Judge on May 1,
2007, the parties argued their positions, including Lead Plaintiff's assertion not only that the use of
search terms was improper, but also that Defendants' search terms were insufficient. Magistrate
Judge ruled that Lead Plaintiff's request concerning Defendants' use of search terms was untimely.
As discussed above, on April 25, 2007, Defendants began a rolling production of documents
recovered from Veeco's backup tapes.

### 5.    Defendants' Request to File a Motion for Summary Judgment

71.    In a twelve-page letter dated May 29, 2007, Defendants requested the Court's
guidance as to whether the Court would consider a motion for summary judgment based on a lack
of proof of scienter. In that letter, Defendants stated that the TurboDisc controller, Bruce Huff,
denied making certain of the statements in the Complaint attributed to the confidential witness who
was known to be Mr. Huff. The allegations based on those statements constituted the principal
grounds on which Lead Plaintiff had based its allegations concerning Defendants' scienter in the

Complaint. Although discovery had revealed abundant other evidence of Defendants' scienter, and the Court's individual practices provide that the parties' pleadings are deemed amended to embrace the parties' factual contentions in the final pretrial order, Defendants nevertheless took the position that unless Lead Plaintiff could prove the facts alleged in support of the scienter allegations in the existing Complaint, Lead Plaintiff's claims must fail and Defendants were entitled to summary judgment. The Court advised Defendants not to file a summary judgment motion, stating that it would be denied. Although Defendants did not file a summary judgment motion, they subsequently sought to bar, through a motion *in limine*, all testimony at trial on the subject of the facts alleged in the Complaint that were based on information provided by Mr. Huff, which necessarily included the testimony of Mr. Huff, on the ground that there was no evidence of those facts, *i.e.* Defendants sought to bar the introduction of evidence they contended did not exist. *See* ¶77, below.

### H.    Mediation

72.    The parties began discussing mediation in mid-2006 and agreed to schedule a mediation in October 2006, allowing time for the production and review of document discovery. The parties retained the Honorable Nicholas H. Politan, United States District Judge (retired), as the mediator. In preparation for the mediation, the parties prepared extensive mediation statements on liability and damages, as well as extensive compendia of supporting exhibits. On October 11-12, 2006, the parties participated in an intense two-day mediation session with Judge Politan. This mediation session did not result in a settlement of the Action.

73.    Following this initial mediation session, discovery resumed and Lead Plaintiff continued to review the documents produced by Defendants and third-parties in preparation for deposition discovery. As a result of this review, Lead Plaintiff's Counsel identified evidence which

31

they believed further showed the strength of its case and, on December 4, 2006, set forth this evidence in a detailed letter to Judge Politan who, in turn, shared the letter and discussed its contents with Defendants. Once again these mediation efforts did not bear fruit.

74.     On June 18, 2007, shortly before the scheduled final pretrial conference before the Court, the parties agreed to schedule a one-day mediation session with Judge Politan in an attempt to reach an agreement. Although the parties made some progress toward settlement at that session, it continued to appear likely that the Action would be tried. It was only after the final pretrial conference on June 28, 2007 that the parties reached this proposed Settlement. A Memorandum of Understanding ("MOU") was signed on July 5, 2007.

**I.    Final Pretrial Preparations**

75.     The parties completed substantial preparation for trial, including submission of a joint pretrial order to the Court on June 7, 2007, in which Lead Plaintiff provided, *inter alia,* a detailed statement of its contentions of fact and law, a list of exhibits it intended to introduce at trial, a list of witnesses it intended to call at trial, designations of deposition testimony to be introduced at trial and a description of the issued to be tried.

76.     In anticipation of trial, on June 7, 2007, Lead Plaintiff also submitted a comprehensive set of jury instructions to the Court, as well as a proposed verdict form and proposed voir dire questions.

77.     Lead Plaintiff also filed three motions *in limine* and responded to six motions *in limine* filed by Defendants, as follows:

    a.  Because many documents concerning Veeco's internal investigation of accounting errors at Veeco's TurboDisc division and concerning advice Defendants received from their counsel concerning Defendants' compliance

32

with the Sarbanes-Oxley act were withheld from discovery grounds of privilege, Lead Plaintiff's motions *in limine* sought to:

1.      preclude Defendants and their witnesses at trial from claiming to the jury, with respect to any potential errors in TurboDisc's accounting identified prior to the initiation of Veeco's internal investigation of improper accounting entries at TurboDisc which were among the causes of the restatement of Veeco's financial statements for the first three quarters of 2004, that they did not conclude that the potential errors were actual errors until after they had obtained the results or other information from the investigation;

2.      preclude Defendants and their witnesses at trial from making affirmative claims about a belief regarding any issue addressed during the investigation of TurboDisc, including whether the TurboDisc division controller acted fraudulently; and

3.      preclude Defendants from affirmatively contending at trial that they believed in good faith that they were not violating the requirements of the Sarbanes-Oxley Act.

b.      Defendants' motions *in limine* sought to:

1.      bifurcate the trial of this Action into a liability phase and a damages phase;

2.      preclude Lead Plaintiff from presenting any argument or evidence at trial with respect to Veeco's practice of reporting its financial results using fiscal quarters as opposed to calendar quarters;

3.      preclude Lead Plaintiff from advancing arguments at trial relating to allegations in the Complaint for which no supporting evidence had been adduced;

4.      preclude Lead Plaintiff from presenting evidence at trial with respect to the fact or amount of Defendants' Directors & Officers liability insurance;

5.      preclude Lead Plaintiff's damages expert from offering erroneous testimony and calculation regarding potential damages; and

6.      preclude Lead Plaintiff from offering at trial the testimony of Lead Plaintiff's accounting expert Robert W. Berliner.

33

78.    On June 28, 2007, less than two weeks before trial in the action was to commence, the parties participated in a day long pretrial conference with the Court. Among other things, during the conference, the Court ruled on the admissibility of proposed trial exhibits.

79.    During the conference, the Court also lifted the Protective Order and also ruled upon, and subsequently issued a Memorandum and Decision concerning, the parties' motions *in limine*. The Court denied all of the parties' motions *in limine*, except that the Court denied, in part, and granted, in part Defendants' motion concerning the recoverability of damages by persons who held Veeco stock after the price of the stock recovered to the amount paid by them and granted Defendants' motion concerning liability insurance.

**J.    The Settlement Negotiations**

80.    The Settlement of $5,500,000, plus interest, represents a substantial recovery for the Class in light of the attendant risks of continued litigation, as described below. The Settlement negotiations between Lead Plaintiff's Counsel and counsel for the Defendants were conducted at arms-length and in good faith. The negotiations began during the October 2006 mediation, described above, and continued on an on-going basis, with the assistance Judge Politan, up until the eve of trial.

81.    The Settlement negotiations were difficult and intense, and initially the parties were very far apart. Even late into the process, it was not obvious to Lead Plaintiff's Counsel that any settlement would be obtained, as is evidenced by how close the parties were to trial before the Settlement was reached and by the significant effort that Lead Plaintiff expended on its pretrial preparations. Eventually, the parties reached an agreement in principle, memorialized in the MOU signed July 5, 2007. The agreement was subject to adoption of a formal Stipulation and Agreement

34

of Settlement (the "Stipulation") and Court approval, after notice to the Class. The parties worked diligently to draft the Stipulation, resolving many of the issues left open in the MOU, and signed the Stipulation on August 16, 2007.

82.    Lead Plaintiff was kept apprised of all major developments in the Settlement negotiation process. As described herein and in the accompanying Settlement Memorandum, the settlement was the product of diligent efforts of the parties and their counsel.

## II.    DESCRIPTION OF THE SETTLEMENT

83.    Pursuant to the Stipulation dated August 16, 2007, shortly after the Court's preliminarily approved the Settlement, Defendants paid the first tranche of $100,000 of the $5,500,000 Settlement Fund into an escrow account for the benefit of the Class.

84.    The second tranche of $5,400,000 of the Settlement Fund will be paid by the Defendants shortly after the final approval of the Settlement by the Court.

85.    The Stipulation, as well as the Notice sent to members of the Class, provides for a plan to allocate the Net Settlement Fund (the $5.5 million Settlement fund plus interest, less all taxes, Court-approved fees, expenses and award to Lead Plaintiff)(the "Plan of Allocation") to each member of the Class who submits a timely, valid and properly documented Proof of Claim form (the "Authorized Claimants"). This Plan of Allocation is described at length on pages 9-11 of the notice and is summarized in Section IV below.

## III.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED

86.    Although Lead Plaintiff's Counsel was fully prepared to pursue this case to trial, it was not, as illustrated below, without considerable risk. In recommending the Settlement, Lead

Plaintiff's Counsel carefully considered numerous factors, including the complexity, expense and delay inherent in continued prosecution of the Action against the Defendants through the trial and appeal phases.    Lead Plaintiff also faced a difficult burden of proof on issues such as fraud-on-the-market, duty to disclose and correct, materiality, scienter, causation and damages. In addition, Lead Plaintiff faced the usual uncertainties of the outcome of a trial before a jury; the maximum amount Lead Plaintiff could reasonably expect to recover at trial; the delay that would likely be incurred in obtaining a recovery for the Class; and the complexity, cost, risks and delay of the inevitable appellate practice that would follow any verdict in this Action. With these challenges in mind, Lead Plaintiff recognized the substantial and immediate monetary benefit provided to the Class by the Settlement.    Lead Plaintiff's Counsel evaluated these factors with the benefit of substantial factual and legal investigation and analysis that enabled them to comprehensively assess the strengths and weaknesses of the case and, accordingly, to recommend approval of the Settlement.

87.    The Second Circuit has repeatedly identified nine factors that should be considered by this Court in determining whether the Settlement should be approved. *See Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). These factors include:  (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the Settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of Defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in view of the best possible recovery; and (9) the range of reasonableness of the settlement to a possible recovery in view of all the attendant risks of litigation.  As set forth fully in the

36

Settlement Memorandum, and briefly outlined below, the terms of the Settlement achieved by Lead

Plaintiff's Counsel meet each of the *Grinnell* criteria.

## A.    The Complexity, Expense and Likely Duration of the Litigation

88.    This Action, like most securities fraud cases, presented complex factual and legal

issues. The claims advanced by Lead Plaintiff in this Action involved numerous complex and factual

issues requiring extensive expert testimony, such as those involving accounting standards, loss

causation and damages. Lead Plaintiff encountered (and would have certainly continued to encounter

at trial, absent the Settlement) significant litigation risks, including proving all of the necessary

elements to establish that Defendants' dissemination of materially false and misleading statements

regarding Veeco violated Sections 10(b) and 20(a) of the Exchange Act of 1934, and Rule 10b-5

promulgated thereunder. Furthermore, this case involved complex issues of accounting and internal

financial controls which could be difficult to present and prove to a jury. While Lead Plaintiff

obtained critical evidence to support its claims during merits and expert discovery, it was far from

certain whether a jury would find that any or all of the Defendants were liable or that the jury would

find that their level of culpability rose to the level of scienter, especially since one of Lead Plaintiffs

witnesses reneged on some of his claims, there was no alleged insider trading by any Defendants,

and no SEC or other governmental agency who had charged the Company with wrongdoing and no

criminal prosecutions. Without the presence of these factors, it would have been very difficult to

convince a jury of Defendants' fraudulent intent.

89.    Moreover, trial of the Action would have added considerably to the duration and

expense of the litigation. By the time settlement was reached, Lead Plaintiff had spent hundreds of

thousands of dollars in out-of-pocket expenses on merits and expert discovery and pre-trial

37

preparation, with no assurance that they would win a judgment at trial or that, even if they won, whether Defendants would appeal, further delaying recovery for the Class. Moreover, even if Plaintiffs won, there was no assurance they would obtain damages beyond the amount of the settlement.

**B.    The Reaction Of The Class To The Settlement**

90.    It is well-settled that the reaction of the Class to the Settlement is perhaps the most important fact to be weighed in considering its adequacy. This Settlement has been extremely well received by the Class: only one member of the Class has requested exclusion from the Settlement (this member of the Class and one other member of the Class requested exclusion from the Class in response to the Notice of Pendency – before any settlement was announced); and not a single member of the Class has objected to the Settlement or to the fee and expense request.

91.    Lead Plaintiff's Counsel has more than adequate efforts to notify potential members of the Class regarding this Action and the proposed Settlement of this Action. The Class received two separate notices in this Action. First, in compliance with the Court's May 15, 2007 Order, 11,392 copies of the first notice were mailed to potential members of the Class, and a summary notice was published in *The Wall Street Journal* on June 8, 2007, to notify the classes of the pendency of this Action and the certification of the class. In response to this extensive notice procedure, only two (2) individuals opted out of the Action.

92.    Further, in compliance with the Court's August 23, 2007 Order, 15,528 notices of the proposed settlement, fee petition and related matters were mailed to potential members of the class, and a summary notice was published in *The Wall Street Journal* on September 19, 2007. The text of this second Notice provided all of the information on the Settlement, the plan of distribution, the

38

motion for attorneys' fees and expenses, and the requests to reimburse Lead Plaintiff that is required by Rule 23, Fed.R.Civ.P., and particularly Rules 23(e) and 23(h); and the notice provisions of § 21D(a)(7) of the PSLRA, 15 U.S.C. § 78u-4(a)(7). Indeed, among other things, this second notice also provided the members of the Classes with a second opportunity to request exclusion from the Class in order to avoid any potential issues that may arise under Rule 23(e)(3). *See* Sincavage Affidavit at ¶¶ 10-12.

93.    In response to the Notice regarding the Settlement, only one member of the Class (who had previously opted out of the Class in response to the Notice of Pendency) requested exclusion from the Settlement, and no objections to the Settlement were filed. *See* Sincavage Affidavit at ¶ 12.

94.    The Sincavage Affidavit attests to the mailing of the Notice and publication off the Summary Notice in accordance with the Court's August 23, 2007 Order granting preliminary approval of the Settlement. Annexed to the Sincavage Affidavit are the Notice (along with the Proof of Claim attached thereto) and an affidavit obtained from the Advertising clerk of *The Wall Street Journal*, attesting to the publication of the Summary Notice on September 19, 2007. *See* Sincavage Affidavit at ¶¶ 10-11.

95.    As a result, due and sufficient notice of the proposed Settlement, the plan of allocation, the motion by Lead Plaintiff's counsel for an award of fees and expenses and the request for an award to Lead Plaintiff, has been provided to all potential members of the Class, including individual Notice to all members of the Class who could be identified through reasonable effort. As such, the notice program in this Action has satisfied the requirements of Rule 23, the PSLRA and the requirements of due process.

96.    The reaction of the Class, therefore, is a factor that strongly militates in favor of the Settlement.

### C.    The Stage of the Proceedings and the Amount of Discovery Completed

97.    As discussed above, Lead Plaintiff's Counsel achieved the Settlement only after litigating the Action for nearly two years, on the eve of trial, after completing merits and expert discovery, significant interaction with an experienced mediator and substantial preparation for trial.

98.    Specifically, during fact discovery, Lead Plaintiff's Counsel reviewed over 225,000 pages of internal Veeco documents and documents obtained from third-parties, conducted ten (10) depositions of current and former Veeco employees, Veeco's auditor, and Veeco's forensic accountant. During expert discovery, Lead Plaintiff's Counsel received and analyzed the expert reports of Defendants' accounting and damages experts, deposed Defendants' damages expert, and proffered Lead Plaintiff's own accounting expert Robert W. Berliner, CPA, CFE, to opine on issues of liability, and damages expert Steven P. Feinstein, Ph.D. CFA, to opine on issues of loss causation, and damages.

99.    Through these efforts, Lead Plaintiff and Lead Plaintiff's Counsel gained a thorough understanding of the legal and factual issues involved in the litigation. Accordingly, there is no question that Lead Plaintiff and Lead Plaintiff's counsel had a clear view of the strengths and weaknesses of the case, and their knowledge was far more extensive than the norm in securities cases which are resolved at an earlier stage.

### D.    Risks of Establishing Liability

100.    Lead Plaintiff bears the risk of establishing each of the elements of the Exchange Act claims brought against the Defendants. Lead Plaintiff's Counsel believes that all of the liability

issues, particularly materiality and scienter, would be sharply disputed and the uncertainty over Lead Plaintiff's ability to prevail on each issue created a substantial risk that Lead Plaintiff could be unsuccessful if this Action were not settled.

101.    The claims in this case focus on whether Defendants issued false and misleading financial statements with scienter during the Class Period in Veeco's quarterly reports filed with the SEC for the first, second, and third quarters of 2004, and in other statements concerning the Company's financial performance in press releases and analyst conference calls during the Class Period, and whether certain of the Individual Defendants issued false and misleading certificates of compliance with the Sarbanes-Oxley Act in those Forms 10-Q, and whether the price of Veeco securities was inflated during the Class Period and whether Defendants' disclosure of the truth before the market opened on the morning of February 11, 2005 caused the price of Veeco stock to fall, thereby damaging Plaintiff and the other class members. Defendants have sharply contested the merits of Lead Plaintiff's claims with Defendants asserting that Lead Plaintiff could not prove that any Defendant is liable because the Company's restatement of the first three quarters of 2004 was caused solely by the accounting errors of the TurboDisc controller, and that the Company took corrective action as soon as the errors were discovered, including firing the controller and launching an independent investigation. Thus, Defendants would continue to assert, as they have, that even if Veeco's financial statements were restated for three quarters because of accounting errors at TurboDisc, Lead Plaintiff would be unable to prove that the statements were materiality false and misleading and, even if it could prove the falsity of any statements, Lead Plaintiff would be unable to prove that any of the Defendants acted with scienter.

41

102.    Lead Plaintiff recognizes that Defendants' scienter would be hotly contested since there were no allegations that any of the Individual Defendants had any financial motive to commit fraud, none of the Defendants engaged in insider trading during the Class Period, and neither the SEC nor any other governmental agency pursued a case against the company. Defendants would also claim that any flaws in their accounting were the result of reasonable reliance on their auditor, Ernst & Young LLP. Moreover, one of Lead Plaintiff's key witnesses denied making certain statements as alleged in the Complaint. Lead Plaintiff would have to prove scienter by circumstantial evidence of Defendants' conscious or reckless behavior. It is impossible to predict whether a jury would find the circumstantial evidence sufficiently convincing to prove scienter.

103.    Moreover, in attempting to prove to a jury the elements of liability, materiality, causation scienter, including the issues of the role of specific Individual Defendants in the alleged fraud, whether the actions violated GAAP and/or the Sarbarnes Oxley Act, and whether the decline in Veeco's stock price at the end of the Class Period was caused by disclosure of alleged fraud, Lead Plaintiff likely would need to rely heavily on the testimony of its accounting and damages experts. A very lengthy and complex battle of experts likely would have ensued at trial, with highly unpredictable results.

104.    Lead Plaintiff has confidence in its case and believes that numerous facts, including those obtained during discovery, support its claims. Nevertheless, Lead Plaintiff recognizes that these are sharply disputed claims, involving complex accounting and financial issues, and ultimately there was a substantial risk that a court or a jury may find that the Defendants did not violate the federal securities laws. Lead Plaintiff's Counsel recognizes that shareholder class action litigation is notably unpredictable.

42

### E.    Risks of Establishing Damages

105.    The dispute in this case is not limited to the issue of whether Defendants violated the federal securities laws.  Even if Plaintiff succeeded on each and every one of the liability issues and overcome the numerous defenses, both factual and legal, there is still the substantial risk and uncertainty of proving damages and loss causation.  Each of these issues involve distinct problems and Defendants have, and would continue to vigorously contest both damages and loss causation at trial.  Defendants would likely have asserted that little or no damages existed and that any decline in the price of Veeco securities was attributable to market or other non-fraud factors.  Indeed, the damage assessments of experts retained by the parties vary substantially, and the assessment of this crucial element of Lead Plaintiff's case in particular would be reduced at trial to an argument between experts having conflicting analyses of highly complex economic data.

106.    Lead Plaintiff's ability to prove Defendants' liability at various points during the Class Period would also have had a significant impact on damages and there was a risk that some members of the Class would not be entitled to damages if Lead Plaintiff were not able to prove Defendants' liability for all false statements alleged.  For example, if Lead Plaintiff were not able to establish Defendants' scienter for false statements early in the Class Period, then members of the Class who purchased in reliance of those early statements would not have been entitled to damages.  In contrast, the proposed Settlement provides relief for all members of the Class who purchased Veeco stock during the Class Period and sold that stock for a loss before the price of Veeco's stock rose above the price at which they purchased the stock.

107.    Most important, even if Defendants were found liable, Lead Plaintiff was constrained in its ability to prove damages of certain Class members as a result of the Court's June 28, 2007

ruling on Defendants' motion *in limine* to preclude Lead Plaintiff's damages expert from offering certain calculations as to potential damages. Specifically, the Court's ruling sharply reduced the amount of provable damages because the Court held that Lead Plaintiff's damages calculations could not include Class Members who purchased Veeco stock during the Class Period which they either sold at a profit or retained past the point after the Class Period when the stock price first recovered to the price at which the shares were purchased, since they can prove no economic loss that is attributable to any of the Defendants' alleged misrepresentations. This ruling substantially diminished the number of damaged class members and the amount of the calculated damages.

108.    In addition, the Class can only recover those actual out-of-pocket losses that Lead Plaintiff proves were proximately caused by the disclosure of Defendants' alleged fraud – not losses caused by other factors, such as market forces. Lead Plaintiff bears the burden of proving that the Class was, in fact, damaged by reason of Defendants' conduct and the amount of damages caused by such conduct. If Lead Plaintiff failed to satisfy its burden on either issue, the Class would receive nothing. Lead Plaintiff would have to prove that the drop in Veeco's stock price on February 11, 2005 was attributable to disclosures correcting previous misrepresentations.

109.    Aside from proving loss causation, Lead Plaintiffs would have considerable risk in proving damages of any magnitude. The presentation of damage testimony includes testimony on the impact of varying complex economic factors, including general market conditions and the impact of various disclosures. Proving causation, market impact and damages involves highly complex valuation models that require supporting testimony of expert witnesses qualified in the field of financial economics.

110.    In sum, Lead Plaintiff and Defendants would likely present conflicting evidence at trial with respect to numerous issues that bear upon the amount of damages that would be recoverable if Lead Plaintiff prevailed on each of its claims. There is considerable uncertainty regarding how these issues would fare at trial. The complex damage and market impact issues on which the parties disagree include:

a.    the appropriate economic model for determining the amount by which Veeco securities were artificially inflated during the Class Period;

b.    the amount by which Veeco securities were allegedly inflated (if at all) during the Class Period;

c.    the various market forces influencing the trading prices of Veeco securities during the Class Period;

d.    the extent to which external factors, such as general market conditions or factors unrelated to the claimed violations, influenced the trading prices of Veeco securities at various times during the Class Period;

e.    the extent to which the various matters that Lead Plaintiff alleges were false or misleading influenced (if at all) the trading prices of Veeco securities during the Class Period;

f.    the extent to which the various matters that Veeco disclosed that Lead Plaintiff does not allege were false or misleading, or that were otherwise publicly available to investors, counteracted or nullified the effect (if any) on the market prices of Veeco securities of those matters that Lead Plaintiff alleges were false or misleading;

g.    whether the statements made or facts omitted were actionable under the federal securities laws; and

h.    the number of shares of Veeco stock that were, in fact, damaged by the alleged misstatements or omission.

111.    Lead Plaintiff believes that it could prove damages of millions of dollars. Nevertheless, Lead Plaintiff recognizes that the damages are sharply disputed, and ultimately a court

or a jury may find that the Defendants' conduct did not cause damages, or that the damages were

much less than those asserted by Lead Plaintiff. In the absence of a settlement, therefore, the parties'

differing views of the damages and the expected battle of the experts, presented a risk that the jury

could find that Defendants' arguments and the opinions of Defendants' experts supported an adverse

verdict for Lead Plaintiff and the Class.

**F.    The Risks of Maintaining the Class Action Through Trial**

112.    There is no issue here. The Court certified a class early in this litigation, in March

2006. Only two Class Members opted out after the Initial Notice of pendency in June 2007. The

Defendants did not seek decertification. This factor had no bearing on settlement negotiations.

**G.    The Ability of Defendants to Withstand a Greater Judgment**

113.    This factor had little bearing on settlement negotiations. Although the Individual

Defendants had limited resources and limited insurance, Veeco does have substantial net worth.

However, this factor alone does not prevent the court from approving the settlement where the other

*Grinnell* factors are satisfied.

**H.    The Range of Reasonableness of the Settlement Fund in Light of the Best
        Possible Recovery, and in Light of Litigation Risks**

114.    The $5.5 million all-cash recovery in this Action is significant and, in light of the

risks facing Lead Plaintiff, the unpredictability of a lengthy and complex trial, the inevitable

appellate process that would follow with the risk of reversal, and the limits on damages posed by the

Court's opinion, the $5.5 million Settlement falls squarely within the range of reasonableness.

115.    Published data on securities fraud settlements further confirms the quality of the

proposed Settlement. The $5.5 million settlement results in an estimated average recovery of $.87

per share of Veeco common stock for the approximately 6.3 million shares which suffered damages, in accordance with the Court's June 28, 2007 opinion, or 23.2% of the maximum $3.75 per share suffered by any Class Member. The 23.2% possible recovery of estimated damages exceeds the median percentage reported by Cornerstone Research for settlements overall, which was 3.6% through year-end 2005 and 2.4% for 2006. For settlements where the estimated damages were less then $50 million (similar to this case) the percentage was 10.5% through year-end 2005 and 8.8% in 2006. *See* Laura E. Simmons & Ellen M. Ryan, *Cornerstone Research, Securities Class Action Settlements: 2006 Review and Analysis* (Cornerstone Research 2007) at p. 6, http://www.cornerstone.com.

116.    In view of the risk that the jury could have found that Lead Plaintiff and members of the Class were entitled to no recovery, the proposed settlement that represents a recovery of up to 23.2% of the possible damages supports approval of the settlement. Accordingly, these measures also weigh in favor of approval of the Settlement.

I.    **The Settlement Negotiations**

117.    The negotiations for the Settlement, like every step of the litigation, were intense, hard-fought and conducted at arm's-length between experienced and skilled attorneys who knew the strengths and weaknesses of their respective cases and were ready for trial to begin on July 9, 2007.

118.    In addition, in the course of litigation, both sides had exchanged mediation statements which revealed the respective strengths and weaknesses of the claims and defenses. The mediation that finally resulted in this settlement followed the end of merits and expert discovery and preparation for trial.

47

119.    In summary, after review of all of the factors to be evaluated in determining the fairness of a Settlement, Lead Plaintiff's Counsel is convinced that the Settlement is fair and reasonable and in the best interests of the Class. In view of the sharply contested factual and legal issues, the uncertainties and enormous costs and delays inherent in continuing the litigation, the tacit approval of the Settlement by thousands of Class Members, and the approval of Lead Plaintiff, it is submitted that the Settlement meets and indeed exceeds all of the requirements for Court approval under Rule 23(e).

## IV.    THE PROPOSED PLAN OF ALLOCATION IS REASONABLE AND SHOULD BE APPROVED

120.    The Plan of Allocation, set out at length on pages 9-11 of the Notice approved by the Court, is intended to balance the equities among members of the Class in allocating the Net Settlement Fund in a fair, reasonable and cost-effective manner. As indicated in the Notice, each Class member submitting a Proof of Claim (an "Authorized Claimant") will receive an amount that is proportionate to his Recognized Claim.

121.    Under the Plan of Allocation, an independent claims administrator, Heffler, Radetich & Saitta LLP, will calculate each claimants' "recognized loss" based on the class members' proof of claims.

122.    The Plan of Allocation was prepared according to the analysis of Lead Plaintiff's damage expert, Steven P. Feinstein, Ph.D., CFA, with the assistance of Lead Plaintiff's Counsel, and in accordance with the Court's June 28, 2007 decision on Defendants' motion *in limine* regarding damages.    The Plan takes into account that (i) members of the Class who purchased Veeco stock during the Class Period which they either sold at a profit or retained past the point after the Class

48

Period when the price of Veeco stock recovered to the price paid by them were not damaged; (ii) the price varied at which Veeco stock declined following the Company's corrective disclosure on February 11, 2005; and (iii) that any member of the Class who sold before the corrective disclosure was not damaged.    Thus, an Authorized Claimant's recognized loss ("Recognized Loss") is primarily determined by the date the Authorized Claimant purchased or sold any of Veeco's securities, as set forth in detail in the Notice.

123.    The Plan of Allocation also follows the Supreme Court's decision in *Dura Pharmaceuticals*, and requires that claimants must have purchased the common stock of Veeco during the class period and held it at the close or trading on February 10, 2005 -- the day prior to the disclosure. *See, e.g., Dura Pharm. v. Broudo*, 544 U.S. 336 (2005).

124.    The plan of allocation also follows the Court's June 28, 2007 decision on Defendants' motion *in limine* concerning Lead Plaintiff's damages expert finding that members of the Class who eventually sold their shares for a profit, or held their shares past the point in time after the Class Period at which Veeco stock traded at a price greater than that at which it was purchased, have not suffered a loss.

125.    The Plan of Allocation is a standard calculation of recognized loss. For purposes of determining when shares of Veeco common stock purchased during the Class Period were sold, purchases and sales of Veeco shares will be matched, on a "first-in, first-out" ("FIFO") basis, by matching the first shares sold against any shares held as of April 23, 2004 (the last trading day prior to the start of the Class Period) and then on a FIFO basis against any additional shares purchased during the Class Period on the basis of the assumption that the first share purchased was the first share sold. The matching under FIFO will be applied irrespective of the different accounts in which

the Veeco shares were purchased and sold unless the title or ownership of the accounts differed. Any sale of Veeco shares, during or after the Class Period, that results in a gain shall have Recognized Loss of zero and the gain will not be deducted from an Authorized Claimant's Recognized Loss on Veeco shares that, on a FIFO basis, were purchased during the Class Period and sold for a loss during or after the Class Period.

126.    The Plan of Allocation fairly and adequately allocates the proceeds of the Settlement among the members of the Class. For these reasons, the plan of allocation is fair, reasonable and adequate to all members of the Class and should be approved.

## V.    PETITION FOR ATTORNEYS FEES AND LITIGATION EXPENSES

### A.    Introduction

127.    Lead Plaintiff's Counsel's efforts to date have been without compensation of any kind and any fee has been wholly contingent upon the results achieved. As compensation for these efforts, Lead Plaintiff's Counsel requests that this Court award them attorneys' fees of 30% of the $5,500,000 Settlement Fund, reimbursement of $774,329.29 in expenses that Lead Plaintiff's Counsel incurred in successfully prosecuting the claims in this Action, and reimbursement of $16,089 in costs and expenses Lead Plaintiff Steelworkers Pension Trust directly relating to the representation of the Class.

128.    The Second Circuit in *Goldberger* has articulated the following six factors for consideration in determining Plaintiffs' Counsel's fee award: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).

129.    As set forth in detail in the accompanying Fee Memorandum, consideration of the relevant *Goldberger* factors clearly supports an award of 30% of the Settlement Fund to Lead Plaintiff's Counsel.

### 1.    The Time and Labor Expended by Counsel

130.    Lead Plaintiff's Counsel has devoted over 12,000 hours to the prosecution and settlement of this Action, including: (1) filing the Complaint, extensive investigatory work prior to filing the Complaint, and briefing related to Defendants' motion to dismiss the Complaint; (2) moving for certification of the Class and related briefing; (3) extensive fact and expert discovery, including a review of over 225,000 pages of documents from Defendants and third-parties, conducting and defending depositions of key witnesses, serving and responding to numerous interrogatories and requests for admission, and engaging experts on accounting and damages issues; (4) filing and responding to several hard-fought discovery-related motions, including participating in hearings, both in person and telephonically, before the Court; (5) preparing detailed mediation statements and participating in several days of mediation; and (6) completing substantial preparation for trial, including preparation of a final pretrial order, proposed jury instructions, proposed voir dire instructions and a proposed verdict form, filing and responding to numerous motions *in limine* and attending a final pre-trial conference before the Court on June 28, 2007.

131.    In addition to the time and labor expended by Lead Plaintiff's Counsel, Lead Plaintiff's Counsel also incurred $774,329.29 in expenses on this matter since its initiation. *See* Broderick Affidavit.

132.    Each of these tasks undertaken by Lead Plaintiff's Counsel was necessary, especially in light of the Defendants' unusually vigorous defense, in order to achieve the result currently

presented to the Court as the proposed Settlement. The time and labor expended by counsel in producing this Settlement thus supports the requested fee. Furthermore, the attorneys' fees requested by Lead Plaintiff's Counsel represent a multiplier of only .3591 of Lead Plaintiff's Counsel's lodestar. As a result, Lead Plaintiff's Counsel will receive no compensation for almost two-thirds of their time.

### 2.    The Magnitude and Complexities of the Litigation

133.    Lead Plaintiff's Counsel has effectively and efficiently litigated this complex action from the filing of the Complaint through the discovery and motion practice and up until final trial preparations. This case was particularly hard-fought against a well-staffed team of aggressive defense lawyers from the large law firm, Gibson Dunn & Crutcher, LLP who conducted an unusually vigorous defense, for almost two years, up until the eve of trial. Furthermore, Plaintiffs' Counsel did not "piggy back" on any prior governmental action related to Veeco. Prosecution of this Action was heavily dependent on expert testimony, thereby adding substantially to its costs. Plaintiffs have encountered, and would certainly continue to encounter at trial, absent the Settlement, significant litigation risks, including successfully proving all of the necessary elements to establish that Defendants' dissemination of materially false and misleading statements regarding Veeco violated Rule 10b-5 and proving that any or all of the price drop of the stock was attributable to the disclosure of the alleged fraud as opposed to market factors. Most importantly, Plaintiffs ability to prove substantial damages was sharply reduced is a result of the Court's June 28, 2007 ruling on Defendants' motion *in limine*, finding that some class members had suffered no damages.

134.    In addition, as described in the Fee Memorandum, the particular complex and difficult issues in this case included: (1) proving Lead Plaintiff's claims through the testimony of Veeco's

employees and former employees, who could be considered hostile witnesses; (2) the difficult task of establishing loss causation in light of the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005); and (3) the complexity of the legal and factual accounting issues and internal control issues that had to be presented to substantiate Plaintiffs' allegations of fraud and scienter, including showing that Defendants violated GAAP and the Sarbanes-Oxley Act.

### 3.    The Risk of the Litigation

135.    The contingent nature of Lead Plaintiff's Counsel's representation of the Class, with the built-in risk of litigation, is a highly relevant factor in support of Lead Plaintiff's Counsel's request for attorney's fees. The risk of non-payment in complex cases, such as this one, is very real. There are numerous class actions in which counsel expended thousands of hours and yet received no remuneration whatsoever despite their diligence and expertise. Lead Plaintiff's Counsel undertook the litigation and advanced the costs on a contingent basis, bearing the full risk of no recovery at all. They undertook this litigation without the assistance of a federal investigation, knowing that they could easily litigate the case for years, expend thousands of attorney hours, and hundreds of thousands of dollars for expenses, and then lose at summary judgment or trial. Lead Plaintiff's Counsel in fact, litigated this Action for more nearly two years up until the eve of trial, through discovery, class certification, a motions to dismiss, numerous discovery motions, expert discovery and final preparations before trial, and their efforts demonstrate their commitment to obtaining valuable and meaningful relief for the Class.

### 4.    The Quality of Representation

136.    In this case, the quality of the representation of Lead Plaintiff's Counsel is best evidenced by the result. Despite vigorous opposition by Defendants at every stage up to trial,

53

Plaintiffs obtained a Settlement in of $5.5 million in cash from Defendants. Not only did Lead Plaintiff's Counsel's skill and expertise contribute to the favorable settlement for the class, it contributed to the overall efficiency of the case.

137.    In addition, Defendants were represented by well-staffed team of aggressive lawyers from the New York office of Gibson, Dunn & Crutcher, LLP, one of the country's largest law firms, who spared no cost or effort in tenaciously challenging Lead Plaintiff at every stage of the litigation up until the eve of trial. That Lead Plaintiff's Counsel was able to obtain a substantial settlement from these Defendants confirms the quality of their representation in this matter, and is another important factor for the Court to consider in determining the reasonableness of Lead Plaintiff's Counsel's fee request.

### 5.    The Requested Fee in Relation to the Settlement

138.    As discussed in the Fee Memorandum, the requested amount of attorneys' fees, $1.65 million, representing 30% of the total all-cash recovery to the Class is fully consistent with fees awarded in other securities class action settlements, especially those of comparable value, in this Circuit. Moreover, Lead Plaintiff's Counsel's requested attorneys' fees will certainly not create a windfall for Lead Plaintiff's Counsel.

### 6.    Public Policy Considerations

139.    As discussed in the Fee Memorandum, public policy considerations support an award of Lead Plaintiff's Counsel's requested attorneys' fees. Private enforcement of the federal securities laws, such as this case, is a necessary adjunct to government intervention because neither the SEC nor the Justice Department has sufficient assets to address all forms of securities fraud and private

attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities like securities fraud.

140.    In addition, public policy considerations support the award in this case because the Lead Plaintiff and Class Representative, Steelworkers Pension Trust, a large public pension fund, conscientiously supervised the work of lead counsel and has approved the fee request, which accords with Congress' belief that institutions would be in the best position to monitor the ongoing prosecution of the litigation and to assess the reasonableness of counsel's fee request.

**B.    The Requested Fees Are Fair and Reasonable As a Percentage of the Benefits Obtained**

141.    Compensating counsel in common fund cases on a percentage basis makes eminently good sense. First, it is consistent with the practice in the private marketplace where contingent fee attorneys are customarily compensated on a percentage of the recovery method. Second, it provides Lead Plaintiff's Counsel with a strong incentive to effectuate the maximum possible recovery in the shortest amount of time necessary under the circumstances. Third, use of the percentage method decreases the burden imposed upon the Court by the "lodestar" method and assures that members of the Class do not experience undue delay in receiving their share of the Settlement.

142.    Here, the requested fee of 30% of the $5,500,000 Settlement Fund, is in line with fee awards in this Circuit. An expansive sampling of such cases showing fees awarded in common fund cases around 30% is set forth in the Fee Memorandum.

**C.    The Fee Request is Separately Supported Under a Lodestar Analysis**

143.    As set forth in the Fee Memorandum, the percentage-of-the-fund method is the appropriate method for awarding attorneys' fees in this and other Circuits..

144.    However, in addition to the currently preferred "percentage-of-the-recovery" approach, the traditional "lodestar" approach, which serves as a cross-check, separately supports the fee award sought by Lead Plaintiff's Counsel in this case and demonstrates that the percentage sought by Lead Plaintiff's Counsel is reasonable. *See* the Fee Memorandum for case law on the lodestar method.

### 1.    The Hours Expended Are Reasonable In Light of the Complexity and Duration of the Litigation

145.    As indicated above and in the affidavit of Lead Plaintiff's Counsel submitted with the Fee Memorandum, Lead Plaintiff's Counsel devoted over 12,000 hours to this litigation, resulting in a lodestar of $4,594,233.40. A summary of the hours, lodestar and expenses is included in the Affidavit of Carole A. Broderick, Esq. in Support of Petition for Attorneys' Fees and Reimbursement of Expenses Filed on Behalf of Berger & Montague, P.C. (the "Broderick Affidavit"), filed concurrently herewith. As explained, in the affidavit, these hours were compiled from contemporaneous time records maintained by each attorney and each paralegal which participated in this case.

146.    The requested fee represents only a fractional multiplier of the lodestar. Plaintiffs' Counsel performed an enormous amount of work on behalf of the Class, litigating this case to the eve of trial against a formidable and aggressive opponent. In addition, Berger & Montague bore all of the risks and expenses of the litigation, including extensive fact and expert discovery, motion practice, participation in and preparation of submissions for mediations, and preparation for trial. Lead Plaintiff's Counsel made every effort to be efficient in litigating this action. Berger & Montague is highly experienced in prosecuting securities law claims and shareholder class actions

and believes that it was able to perform the various tasks necessary to advance Lead Plaintiff's and the Class' interests in a more efficient manner compared with counsel with a lesser degree of specialization in this highly-complex field.

### 2.    The Hourly Rates of Lead Plaintiff's Counsel Are Reasonable

147.    To arrive at the lodestar, the hours expended are multiplied by each attorney's respective hourly rate. The hourly rate to be applied in calculating the lodestar is that which is normally charged in the community where the attorney practices. In determining whether the rate is reasonable, the Court should take into account the attorney's legal reputation, experience, and status (partner or associate). The declaration accompanying the Fee Memorandum include a description of the background and experience of the firm and attorneys who worked on this case. These descriptions provide ample support for the hourly rates charged in this case.

148.    The results achieved, of course, is of paramount importance in assessing a fair fee under the lodestar method. The benefit conferred by the Settlement in this case, i.e., the creation of a Settlement Fund of $5,500,000 plus interest, obviously demonstrates that Lead Plaintiff's Counsel's fee request, when viewed under the lodestar approach, is appropriate.

149.    The standing and reputation of Lead Plaintiff's Counsel are also relevant considerations in determining a fair fee award.   Lead Plaintiff's Counsel includes nationally recognized practitioners in the field of complex class action litigation. The firm who acted as Lead Plaintiff's Counsel is actively engaged in complex federal civil litigation, particularly in the litigation of securities class actions, and has achieved significant acclaim for their work in securities law. Lead Plaintiff's Counsel's experience in the field allowed them to identify the complex issues involved in this case and to formulate strategies to attack a case of this magnitude and complexity. Their

reputation as attorneys willing to carry a meritorious case through the trial and appellate levels gave them strong leverage in engaging in complex settlement negotiations with Defendants. Descriptions of the background and experience of Lead Plaintiff's Counsel are set forth in the Appendix of the Broderick Affidavit.

150.    Furthermore, Lead Plaintiff's Counsel undertook representation of the Class on a wholly contingent basis. Counsel knew from the outset that they might expend a substantial amount of attorneys' time in pursing this Action, yet received no compensation whatsoever if the Action proved ultimately unsuccessful. The substantial contingent fee risk Lead Plaintiff's Counsel faced also demonstrates that the requested fee is reasonable and justified. Without any assurance of obtaining any compensation for their efforts, Lead Plaintiff's Counsel expended not only substantial time litigating this case, but also substantial resources, including out-of-pocket expenditures. For this additional reason, Lead Plaintiff's Counsel's fee request, representing a fractional multiplier of .3591 times the lodestar, is justified and entirely appropriate under a lodestar analysis. As set forth in the Fee Memorandum, such a multiple is entirely consistent with and, indeed, is lower than multiples awarded in comparable cases.

D.    **Public Policy Considerations Mandate the Award of Adequate Fees in Class Actions so that Competent and Experienced Lawyers Will Undertake Such Representation**

151.    The federal securities laws are remedial in nature, and, in order to effectuate their statutory purpose of protecting investors and consumers, private lawsuits are to be encouraged. That those goals have been achieved here is beyond question. Despite the risks, a sizeable recovery has been obtained for shareholders harmed by the alleged wrongdoing of the Defendants. Despite the risks, a significant service has been provided to all investors in public companies - a demonstration

that the protection provided by the federal securities laws is real and can provide significant benefits through the class action device. In light of these substantial risks, the excellent result obtained on behalf of the Class, and the other factors discussed herein, Lead Plaintiff's Counsel respectfully requests the Court to award the fees and expenses requested.

152.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations. The SEC, a vital but understaffed government agency, does not have the budget or personnel to ensure enforcement of the securities laws. No SEC investigation was conducted involving Veeco. If this important public policy is to be carried out, the courts must award fees which will adequately compensate counsel who take enormous risks to prosecute securities fraud cases.

### E.    Reimbursement of Out-Of-Pocket Expenses Incurred on Behalf of the Class Should be Approved

153.    Lead Plaintiff's Counsel also has requested that their $$774,329.29 in litigation expenses incurred in the prosecution of this Action be reimbursed from the Settlement Fund. The amount of out-of-pocket expenses, by category, incurred in this Action are set out in the Broderick Affidavit. The Affidavit explains that the expenses requested are reflected on the records the firm prepared in the normal course of business and are an accurate record of the expenses incurred. The total amount requested is below the $775,000 limit that was set forth in the Notice, and no member of the Class has objected to even that higher amount. As a result, we respectfully request that Lead Plaintiff's Counsel's request for reimbursement of expenses be granted by the Court.

154.    The largest portion of the $774,329.29 in out-of-pocket expenses incurred by Lead Plaintiff in litigating this case was for accounting and damages experts retained by Lead Plaintiff,

which comprised $543,196.49, or over 70% of the total costs. These expenses reflected the fact the prosecution of this Action was heavily dependent on expert assistance and testimony and that this was a complex case which was litigated until a week before trial. For a description of the work performed by Lead Plaintiff's testifying experts, *see* ¶ 47, above.

### F.    Award to Lead Plaintiff

155.    Lead Plaintiff's Counsel request and award of reasonable costs and expenses to the Lead Plaintiff Steelworkers Pension Trust pursuant to the provision in the PSLRA which states: "Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class." 15 U.S.C. 5 78u-4(a)(4). Lead Plaintiff has submitted a declaration detailing its time spent representing the Class, including time spent preparing for, and providing testimony in a deposition conducted by Defendants. *See* Hoffmann Declaration. As set forth in the Declaration of Richard S. Hoffmann, the Steelworkers expended over eighty hours valued at a total of $15,964.20, and incurred $125 of out-of-pocket expenses directly relating to the representation of the Class. *See* Hoffmann Declaration at ¶11. From the outset of the litigation to settlement, the Steelworkers conscientiously monitored the litigation, and participated in prosecuting the case, including participation in discovery, subjecting itself to deposition, and reviewing significant pleadings and briefs. Hoffmann Declaration at ¶¶6, 11. The Notice states that Steelworkers Pension Trust will seek an award in an amount not to exceed $16,089, and no member of the Class has objected to that amount.

## **DECLARATION OF CAROLE A. BRODERICK**

The foregoing is true and correct to the best of my knowledge, information and belief.

Executed under the penalties of perjury on this 26th day of October, 2007 in Philadelphia,

Pennsylvania.

Carole A. Broderick

malta431915-009.wpd

61